955 F.2d 1268
 Fed. Sec. L. Rep. P 96,507
CLASS PLAINTIFFS; Chemical Bank, in its representative
capacity as Trustee for Bondholders, Plaintiffs-Appellees,
v.
CITY OF SEATTLE; Public Utility District No. 1 of Ferry
County, Washington; Public Utility District No. 1 of
Kittitas County, Washington; Oregon Public Entities, Benton
Rural Electric Association, Washington; Small Utilities
Group, Alder Mutual Light Company; City of Blaine,
Washington, City of Sumas, Washington; Orcas Power & Light
Company, Washington; Public Utility District No. 1 of Pend
Oreille County, Washington; Washington Public Utilities
Group; Public Utility District No. 1 of Mason County; Town
of Steilacoom; Chelan County Public Utility District,
Douglas County Public Utility District; Grant County Public
Utility District; Public Utility District No. 1 of Clallam
County; City of Richland; Public Utility District No. 1 of
Franklin County; Public Utility District No. 1 of Snohomish
County; Columbia Defendants, Central Electric Cooperative,
Inc.; Wood Dawson Smith & Hellman; Washington Public Power
Supply System; R.W. Beck and Associates, Ebasco Services
Incorporated; United Engineers & Constructors, Inc.;
Director Defendants, Participants' Committee Defendants;
Public Utility District No. 1, of Klickitat County; United
States of America, on Behalf of Itself and its Agency, the
Bonneville Power Administration; State of Washington;
Blyth Eastman Paine Webber Incorporated, Defendants-Appellees,
Bernard A. Heerey, et al., Applicants in intervention Appellants.
CLASS PLAINTIFFS; Chemical Bank, in its representative
capacity as Trustee for Bondholders, Plaintiffs-Appellees,
v.
CITY OF SEATTLE; Public Utility District No. 1 of Ferry
County, Washington; Public Utility District No. 1 of
Kittitas County, Washington; Oregon Public Entities, Benton
Rural Electric Association, Washington; Small Utilities
Group, Alder Mutual Light Company; City of Blaine,
Washington, City of Sumas, Washington; Orcas Power & Light
Company, Washington; Public Utility District No. 1 of Pend
Oreille County, Washington; Washington Public Utilities
Group; Public Utility District No. 1 of Mason County; Town
of Steilacoom; Chelan County Public Utility District,
Douglas County Public Utility District; Grant County Public
Utility District; Public Utility District No. 1 of Clallam
County; City of Richland; Public Utility District No. 1 of
Franklin County; Public Utility District No. 1 of Snohomish
County; Columbia Defendants, Central Electric Cooperative,
Inc.; Wood Dawson Smith & Hellman; Washington Public Power
Supply System; R.W. Beck and Associates, Ebasco Services
Incorporated; United Engineers & Constructors, Inc.;
Director Defendants, Participants' Committee Defendants;
Public Utility District No. 1, of Klickitat County; United
States of America, On Behalf of Itself and its Agency, the
Bonneville Power Administration; State of Washington; City
of McMinnville, Oregon; City of Drain, Oregon; Alan H.
Jones; Blyth Eastman Paine Webber Incorporated, Defendants-Appellees,
C. Richard Lehmann, Applicant in intervention Appellant.
CLASS PLAINTIFFS; Chemical Bank in its representative
capacity as Trustee for Bondholders, Plaintiffs-Appellees,
Arthur Hoffer, L.T. Samuels; Norman Benson; John Joseph;
Eugene L. Lentzner; Ann Lentzner as Co-Trustees
of the Eugene Lentzner and Ann Lentzner
Living Trust, Plaintiffs-Appellants,
v.
CITY OF SEATTLE; Public Utility District No. 1 of Ferry
County, Washington; Public Utility District No. 1 of
Kittitas County, Washington; Oregon Public Entities, Benton
Rural Electric Association, Washington; Small Utilities
Group, Alder Mutual Light Company; City of Blaine,
Washington, City of Sumas, Washington; Orcas Power & Light
Company, Washington; Public Utility District No. 1 of Pend
Oreille County, Washington; Washington Public Utilities
Group; Public Utility District No. 1 of Mason County; Town
of Steilacoom; Chelan County Public Utility District,
Douglas County Public Utility District; Grant County Public
Utility District; Public Utility District No. 1 of Clallam
County; City of Richland; Public Utility District No. 1 of
Franklin County; Public Utility District No. 1 of Snohomish
County; Columbia Defendants, Central Electric Cooperative,
Inc.; Wood Dawson Smith & Hellman; Washington Public Power
Supply System; R.W. Beck and Associates, Ebasco Services
Incorporated; United Engineers & Constructors, Inc.;
Director Defendants, Participants' Committee Defendants;
Public Utility District No. 1, of Klickitat County; United
States of America, on Behalf of Itself and its Agency, the
Bonneville Power Administration; State of Washington; City
of McMinnville, Oregon; City of Drain, Oregon; Alan H.
Jones; Blyth Eastman Paine Webber Incorporated, Defendants-Appellees,
CLASS PLAINTIFFS; Chemical Bank, in its representative
capacity as Trustee for Bondholders, Plaintiffs-Appellees,
v.
CITY OF SEATTLE; Public Utility District No. 1, Defendants,
Bernard A. Heerey, Applicant in intervention Appellant.
CLASS PLAINTIFFS; Chemical Bank, in its representative
capacity as Trustee for Bondholders, Plaintiffs-Appellees,
v.
CITY OF SEATTLE; Public Utility District No. 1, Defendants,
C. Richard Lehmann, Applicant in intervention Appellant.
 Nos. 90-15380, 90-15451, 90-15453, 90-16383 and 90-16446.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 7, 1991.*
Decided Feb. 4, 1992.
 
 Charles S. Webb, III, Berger & Steingut, New York City, Jose Gaitan, Gaitan & Kusack, Seattle, Wash., for plaintiffs-appellants.
 Albert R. Malanca, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, Tacoma, Wash., Daniel Murdock, Donovan, Leisure, Newton & Irvine, New York City, Ralph K. Nickerson, Goldendale, Wash., Rockne Gill, Schwabe, Williamson & Wyatt, R. Erick Johnson, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Peter R. Mersereau, Rankin, VavRosky, Doherty, MacColl & Mersereau, Portland, Or., Dwight A. Halstead, Prosser, Wash., Steven J. Palmer, Flynn, Merriman & Palmer, Kennewick, Wash., Malcolm S. Harris, Harris, Orr & Wakayama, Seattle, Wash., J. Christopher Kohn, U.S. Dept. of Justice, Commercial Litigation Branch, Washington, D.C., David A. Bennett, Bennett & Bigelow, Seattle, Wash., Ralph G. Wellington, Schnader, Harrison, Segal & Lewis, Philadelphia, Peter J. Nickels, Covington & Burling, Washington, D.C., Otto G. Klein, Heller, Ehram, White & McAuliffe, Roy J. Moceri, Reed, McClure, Moceri, Thonn & Moriarty, Seattle, Wash., James J. Hagan, Simpson, Thacher & Bartlett, New York City, Jerry B. Edmond, William, Kastner & Gibbs, Seattle, Wash., David F. Jurca, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., Everett B. Clary, O'Melveny & Myers, G. Edward Fitzgerald, Gibson, Dunn & Crutcher, Los Angeles, Cal., John D. Lowery, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for defendants-appellees.
 Edward A. Grossmann, Bernstein Litowitz Berger & Grossmann, New York City; Melvyn I. Weiss, Milberg Weiss Bershad Specthrie & Lerach, New York City; Michael J. Meehan, Molloy, Jones & Donahue, Tucson, Ariz., Robert H. Baron and Richard W. Clary, Cravath, Swaine & Moore; Harold R. Tyler, Jr., Patterson, Belknap, Webb & Tyler, New York City, for plaintiffs-appellees.
 Robert M. Sedgwick, Holtzmann, Wise & Shepard, New York City, C. Richard Lehmann, Miami Lakes, Fla., for applicants in intervention appellants.
 Appeal from the United States District Court for the District of Arizona.
 Before WALLACE, Chief Judge, BRUNETTI and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 
 1
 These consolidated appeals involve challenges to the district court's approval of settlement agreements and a plan of allocation in securities litigation. The case arose out of the nation's largest bond default, the 1983 default on $2.25 billion in revenue bonds issued in order to finance the construction of two nuclear power plants in the State of Washington that were never completed. For the following reasons, we affirm the district court's approval of the settlement agreements and Allocation Plan in all respects.
 
 FACTS AND PROCEEDINGS
 
 2
 The facts are set forth by the district court in In re Washington Public Power Supply Sys. Sec. Litig., 720 F.Supp. 1379 (D.Ariz.1989). We summarize.
 
 
 3
 * In 1976, the Washington Public Power Supply System ("WPPSS")[1] entered into agreements ("Participants' Agreements") with eighty-eight public utilities in the Pacific Northwest under which each participating utility ("Participant") purchased a percentage of the project capability of two nuclear power plants being built by WPPSS. The two plants, Project 4 and Project 5 ("Projects 4/5"), were among five nuclear power plants which WPPSS had undertaken to construct in the 1970s. Under the Participants' Agreements, each Participant agreed to pay its percentage share of costs incurred by WPPSS to finance, construct, and operate Projects 4/5, whether or not the Projects were completed, operable, or operating. During the next five years, WPPSS issued $2.25 billion in bonds to finance Projects 4/5.
 
 
 4
 On January 22, 1982, construction of Projects 4/5 was terminated. At that time, Project 4 was approximately 24 percent completed and Project 5 approximately 16 percent completed. Costs had almost reached the original estimated total cost for complete construction of both plants. WPPSS alleged that termination was necessary due to its inability to obtain adequate financing.
 
 
 5
 The Participants would have been obligated to commence payments to WPPSS one year later. Before the payments became due, however, several actions were filed by ratepayers, certain Participant utilities, and Chemical Bank in its capacity as Trustee for all Projects 4/5 Bondholders. These actions sought to contest or enforce the Participants' obligations to make payments to WPPSS under the terms of the Participants' Agreements. On June 15, 1983, the Washington Supreme Court held that certain of the Participant municipal utilities lacked authority to enter into the Participants' Agreements. Chemical Bank v. Washington Public Power Supply Sys., 99 Wash.2d 772, 666 P.2d 329 (1983), aff'd on reh'g, 102 Wash.2d 874, 691 P.2d 524 (1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985). On remand to the State Superior Court, the remaining Participants' Agreements were held to be unenforceable. On appeal, the Washington Supreme Court affirmed, thereby releasing the remaining Participants from their payment obligations. Chemical Bank v. Washington Public Power Supply Sys., 102 Wash.2d 874, 691 P.2d 524 (1984), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985).
 
 B
 
 6
 Early in 1983, numerous class actions alleging securities law violations in connection with the sale of the Bonds were filed in the United States District Courts for the Western District of Washington and the Southern District of New York. Initially the class actions were brought on behalf of purchasers of WPPSS Projects 4/5 bonds from March 1, 1977 through January 22, 1982. The complaints were amended to include Bondholders who had purchased bonds from January 23, 1982 through June 15, 1983. These two groups of purchasers ("MDL 551 Class Members") were certified under Fed.R.Civ.P. 23 as the Pre-Termination and Post-Termination Classes, respectively. In August 1983, Chemical Bank undertook similar litigation on behalf of all Projects 4/5 Bondholders ("Bondholders").[2] The actions were consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the United States District Court for the Western District of Washington in Seattle under the caption "MDL 551."
 
 
 7
 The Complaint filed on behalf of all MDL 551 Class Members alleged violations of both federal and Washington state securities laws as well as violation of the common law. The Chemical Bank Complaint alleged securities fraud, negligence, and other claims under state and federal law as well as breach of contract claims. Both actions primarily revolved around allegations of material misrepresentations or omissions in the prospectuses, or "Official Statements," issued in connection with the offer and sale of the Bonds. The Complaints asserted claims against WPPSS; its directors; the nineteen public utilities and four cities that were members of WPPSS; the sixty-eight Projects 4/5 Participants that were not members of WPPSS; the individual and alternate members of the Projects 4/5 Participants Committee; and the Bonneville Power Administration ("BPA"). The Class Complaint also asserted claims against Blyth Eastman Paine Webber, the financial consultant to WPPSS; R.W. Beck and Associates, the consulting engineers to WPPSS; United Engineers and Constructors, and Ebasco Services Incorporated, the architect/engineers for Projects 4/5; Wood Dawson Smith Hellman, bond counsel to WPPSS; Houghton Cluck Coughlin & Riley, special counsel to WPPSS; Merrill, Lynch, Pierce, Fenner & Smith Incorporated, Solomon Brothers Inc., Smith Barney Harris Uphan & Co., Incorporated, and Prudential-Bache Securities, Inc., bond underwriters; and Moody's Investors Service and Standard & Poor's Corporation, securities rating agencies.
 
 
 8
 The MDL 551 litigation proceeded for more than five years. Multiple motions to dismiss or for summary judgment were argued and considered by the district court.[3] Special Masters and protocols were used extensively. Discovery was comprehensive. An estimated 200 million document pages were produced. Depositions of more than 300 persons were taken over a period of three and one-half years. Approximately 285 fact witnesses were deposed over a two-year period. In addition, 34 expert witnesses were deposed beginning in November 1987.
 
 
 9
 On February 10, 1987, the district court filed an order changing venue from the Western District of Washington to the District of Arizona pursuant to 28 U.S.C. § 1404(a). On petition for mandamus, we upheld the district court's order. Washington Public Utilities Group v. United States Dist. Court, 843 F.2d 319 (9th Cir.1987).
 
 
 10
 Trial commenced on September 7, 1988. Seventeen jurors heard opening arguments and the testimony of a single witness until December 1988. At that time, final settlement agreements were reached. The majority of the settlements occurred prior to the start of trial. The remainder were reached during the two and one-half months of trial.
 
 
 11
 The settlements called for payment into a Settlement Fund of more than $580 million before interest. Four previously approved settlement agreements involved payments of an additional $107 million.
 
 
 12
 Notice of these settlements and of Settlement Hearings was provided to MDL 551 Class Members through an extensive mail and publication program in accordance with Rule 23. The notice was also sent to all known Projects 4/5 Bondholders. In addition, Chemical Bank undertook to notify known Bondholders in a separate notice.
 
 
 13
 The district court heard from all persons who wished to speak, and considered papers filed in support of or in opposition to the settlements as well as over 400 letters from individuals.
 
 
 14
 On September 5, 1989, the district court approved the settlement agreements. 720 F.Supp. at 1395-1424. The district court held that the combined settlements of more than $580 million before interest were fair, reasonable, and adequate. The district court amended its September 5, 1989 order and judgment approving the settlement agreements on February 27, 1990, certifying it as final pursuant to Fed.R.Civ.P. 54(b).
 
 
 15
 Counsel for the MDL 551 Class Members and Chemical Bank negotiated a single proposed plan of allocation to govern the division of settlement proceeds in the Net Settlement Fund between the Bond Fund and the Classes. Counsel for the MDL 551 Class Members also determined the differing entitlements for the Pre-Termination and Post-Termination MDL 551 Class Members. Notice of the final combined plans, referred to as the Plan of Allocation of the MDL 551 Settlement Fund ("Allocation Plan"), was provided to all MDL 551 Class Members and to all known Bondholders through a mail and publication program. MDL 551 Class Members and Bondholders were given an opportunity to file objections to the Allocation Plan and to appear and be heard.
 
 
 16
 The district court heard objections from several Bondholders who were not MDL Class Members.
 
 
 17
 On September 21, 1990, the district court filed its order approving the Allocation Plan.
 
 C
 
 18
 Three groups appeal the district court's order approving of the settlement agreements and its order approving of the Allocation Plan.
 
 
 19
 The district court had jurisdiction over MDL 551 pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 1331, and principles of pendant jurisdiction. We have jurisdiction over these timely appeals pursuant to 28 U.S.C. § 1291.
 
 DISCUSSION
 
 20
 I. Standards for Approval of Class Action Settlements
 
 
 21
 Fed.R.Civ.P. 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court...." Although Rule 23(e) is silent respecting the standard by which a proposed settlement is to be evaluated, the "universally applied standard is whether the settlement is fundamentally fair, adequate and reasonable." Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). See generally Marc Galanter, The Federal Rules and the Quality of Settlements, 137 U.Pa.L.Rev. 2231 (1989).
 
 
 22
 Our task on appeal is a very limited one. "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." Officers for Justice, 688 F.2d at 625. We are not permitted to "substitute our notions of fairness for those of the district judge and the parties to the agreement." Id. at 626. This is especially true in light of the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned. See, e.g., id. at 625 ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution."); In re Corrugated Container Antitrust Litig., 643 F.2d 195, 207 (5th Cir.1981) (noting the "strong judicial policy favoring settlement of disputes"). Accordingly, we will reverse "only upon a strong showing that the district court's decision was a clear abuse of discretion." Officers for Justice, 688 F.2d at 626.
 
 II. Challenges of the Heerey Group
 
 23
 Appellants Bernard A. Heerey, et al. (the "Heerey Group") are Projects 4/5 Bondholders who purchased the majority of their bonds after June 15, 1983, and therefore, for the most part, are not MDL 551 Class Members.[4] Members of the Heerey Group hold in excess of twenty percent of outstanding Projects 4/5 bonds. As the district court noted, the class boundary date, June 15, 1983, "marks the day the Washington Supreme Court effectively informed the world that the Participants' guarantee that they would repay investors was worthless. Investors who purchased 4/5 bonds after that day did so with knowledge that there was no 'guaranteed' source of payment of the principal and interest on the bonds." 720 F.Supp. at 1420 (emphasis in original).
 
 
 24
 The gravamen of the Heerey Group's objections to the settlement and the Allocation Plan revolve around certain anti-suit injunction provisions that purport to release, dismiss, and enjoin further litigation against the settling parties based on the subject matter of the claims resolved by the MDL 551 settlements. The anti-suit injunctions would serve to bar further prosecution by the Heerey Group of a pending suit, Heerey v. Washington Public Power Supply Sys., (Sup.Ct.N.Y.County) ("Heerey "), brought in April 1989 in New York state court by a majority of its members against six of the MDL 551 defendants.[5] The pending action raises state law fraud and contract claims similar to the federal and state law claims asserted in MDL 551.[6]
 
 A. Standing
 
 25
 Chemical Bank, as Bond Fund Trustee, undertook litigation on behalf of all Bondholders throughout MDL 551. Before we consider their substantive challenges, we must determine whether the Heerey Group has standing to bring these appeals.
 
 
 26
 We have held that a non-party who is enjoined or otherwise directly aggrieved by a judgment has standing to appeal the judgment without having intervened in the district court. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1546-47 (9th Cir.1990). This case presents a straightforward application of this principle. The anti-suit injunctions purport to enjoin the Heerey Group from bringing parallel actions against the settling defendants based on the subject matter of the claims resolved by the MDL 551 settlements. We therefore hold that the Heerey Group has standing to appeal.
 
 B. Challenges to the Settlement Agreements
 
 27
 On the merits, the Heerey Group contends that Chemical Bank did not have authority to agree to the anti-suit injunctions and did not adequately represent the interests of its members.
 
 
 28
 1. Jurisdiction and Authority of the District Court To Approve the Settlement Agreements
 
 
 29
 The Heerey Group maintains that it cannot be bound directly by injunctions because its members were not joined as parties. Additionally, the Heerey Group insists that because its members lacked minimum contacts with the forum and were neither served with process nor accorded an opportunity to opt out, they cannot be bound by injunctions which purport to bind them in personam. Finally, the Heerey Group argues that because its members were not parties to MDL 551, the anti-suit injunctions violate the Anti-Injunction Act, 28 U.S.C. § 2283, and Fed.R.Civ.P. 65(d).
 
 
 30
 We review de novo the district court's determination that it had jurisdiction to enter the anti-suit injunctions. Persons v. United States, 925 F.2d 292, 294 (9th Cir.1991). "It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 110, 89 S.Ct. 1562, 1569, 23 L.Ed.2d 129 (1969) (citing Hansberry v. Lee, 311 U.S. 32, 40-41, 61 S.Ct. 115, 117-18, 85 L.Ed. 22 (1940)). This general rule of constitutional fair play represents a restriction on judicial power that flows from the due process guarantees of the fifth and fourteenth amendments. Insurance Corp. of Ireland v. Campagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); Hansberry v. Lee, 311 U.S. at 41, 61 S.Ct. at 118.
 
 
 31
 The general rule is subject to certain exceptions. Included amongst these exceptions is the common law principle that a judgment can bind persons not parties to the litigation in question and not subject in personam to the jurisdiction of the court if the persons are in privity with parties to the litigation. United States v. Truckee-Carson Irrigation Dist., 649 F.2d 1286, 1303 (9th Cir.1981), modified on other grounds, 666 F.2d 351 (9th Cir.1982), aff'd in part & rev'd in part on other grounds sub nom. Nevada v. United States, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); Meza v. General Battery Corp., 908 F.2d 1262, 1266 (5th Cir.1990). Privity represents a legal conclusion that the relation "between the party and non-party is so close that the judgment may fairly bind the non-party." Truckee-Carson Irrigation Dist., 649 F.2d at 1303; see also Gill & Duffus Serv., Inc. v. A.M. Nural Islam, 675 F.2d 404, 405 (D.C.Cir.1982) (per curiam) ("The term 'privity' signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive upon the others, although those others were not party to the lawsuit.").
 
 
 32
 "Privity and fairness exist if a party represented the interests of the non-party, such as a guardian or fiduciary might represent a ward or beneficiary." Truckee-Carson Irrigation Dist., 649 F.2d at 1303. The Restatement (Second) of Judgments sets forth the rule:
 
 
 33
 (1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:
 
 
 34
 ....
 
 
 35
 (c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or
 
 
 36
 (d) An official or agency invested by law with authority to represent the person's interests; or
 
 
 37
 (e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.
 
 
 38
 (2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process.
 
 
 39
 ....
 
 
 40
 Restatement (Second) of Judgments § 41 (1982). The federal courts have consistently recognized this common law exception to the general rule of prior adjudication. See, e.g., Kersh Lake Drainage Dist. v. Johnson, 309 U.S. 485, 491, 60 S.Ct. 640, 644, 84 L.Ed. 881 (1940); Kerrison v. Stewart, 93 U.S. 155, 160, 23 L.Ed. 843 (1876); Meza, 908 F.2d at 1266; United States Steel Corp. Plan v. Musisko, 885 F.2d 1170, 1179 (3d Cir.1989), cert. denied, 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990); Pelfresne v. Village of Williams Bay, 865 F.2d 877, 881 and n. 3 (7th Cir.1989).
 
 
 41
 The exception to the general rule of prior adjudication is nonetheless itself subject to certain exceptions. The Restatement (Second) of Judgments sets forth that a person is not bound by a judgment for or against a party who purports to represent him if, among other things:
 
 
 42
 (d) With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked; or
 
 
 43
 (e) The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.
 
 
 44
 Restatement (Second) of Judgments § 42 (1982). The federal courts have similarly recognized these limits on the reach of representative litigation. See, e.g., Hansberry, 311 U.S. at 42-44, 61 S.Ct. at 118-19; Kersh Lake Drainage Dist., 309 U.S. at 491, 60 S.Ct. at 644; Truckee-Carson Irrigation Dist., 649 F.2d at 1303-04. As we noted in Truckee-Carson Irrigation Dist.:
 
 
 45
 Fairness requires that courts place these limits on the binding effects of judgments obtained by representatives.... [A] holding within one of the exceptions is essentially equivalent to a finding that preclusion against the represented party would be a denial of due process. In such cases the "represented" persons are not in privity with the "representative" parties.
 
 
 46
 649 F.2d at 1304 (footnotes omitted).
 
 
 47
 In Kersh Lake Drainage Dist., the Supreme Court expressly stated that the common law exception to the rule of prior adjudication encompasses the relationship between bondholders and their trustee. 309 U.S. at 491, 60 S.Ct. at 644. In pertinent part, the Court stated:
 
 
 48
 It has been held that bondholders are not necessary parties to and are bound by the decree--even if adverse to their interests--in litigation wherein an indenture trustee under a bond issue is a party and exercises in good faith and without neglect his contractual authority to represent and assert the lien securing the issue.
 
 
 49
 Id. (footnote omitted). It is undisputed that the members of the Heerey Group were Bondholders and that Chemical Bank was the Bond Fund Trustee. The critical inquiry to determine whether the district court had both jurisdiction and authority to approve the anti-suit settlement must be whether Chemical Bank was authorized under the Bond Resolution to settle claims on behalf of all Bondholders and whether it acted as an authorized and adequate representative of the Heerey Group's interests.[7] If both of these requirements are met, Chemical Bank was in privity with the members of the Heerey Group when it entered into the settlement and the district court's jurisdiction and authority to enter the anti-suit injunctions pursuant to the settlement agreements would be established under the common law exception to the general rule of prior adjudication. Further, neither the Anti-Injunction Act, 28 U.S.C. § 2283, nor Fed.R.Civ.P. 65(d), would operate to bar the district court's entry of the anti-suit injunctions under these circumstances.
 
 
 50
 The Anti-Injunction Act, 28 U.S.C. § 2283, provides:
 
 
 51
 A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
 
 
 52
 28 U.S.C. § 2283 (1988). Therefore, under the "relitigation exception" to the Act, a federal court is permitted to enjoin a state court proceeding to protect or effectuate its judgment. 28 U.S.C. § 2283.
 
 
 53
 Rule 65(d) provides in relevant part that "[e]very order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participants with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d). In Regal Knitwear Co. v. NLRB, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661 (1945), the Supreme Court stated that Rule 65(d) "is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." Id. at 14, 65 S.Ct. at 481 (emphasis added).
 
 
 54
 2. Authority and Adequacy of Chemical Bank's Representation
 
 
 55
 a. Chemical Bank's Authority Under the Bond Resolution
 
 
 56
 The Heerey Group challenges Chemical Bank's authority under the terms of the Bond Resolution to consent to the anti-suit injunctions. We review de novo the district court's interpretation of the Bond Resolution. See L.K. Comstock & Co. v. United Eng'rs & Constructors, Inc., 880 F.2d 219, 221 (9th Cir.1989).
 
 
 57
 The district court ruled that Chemical Bank was authorized under section 11.4 of the Bond Resolution "to represent all Bondholders as their trustee and attorney-in-fact in prosecuting the claims it alleged on their behalf." In re Washington Public Power, 720 F.Supp. at 1422. Section 11.4 reads in pertinent part:
 
 
 58
 If an Event of Default shall happen and shall not have been waived or remedied, then and in every such case the Bond Fund Trustee ... shall be entitled and empowered to proceed forthwith to institute such suits, actions and proceedings at law or in equity for the collection of all sums due in connection with the Bonds and to protect and enforce its rights and the rights of the holders of the Bonds under the Resolution ... in the enforcement of any other legal or equitable right as the Bond Fund Trustee, being advised by counsel, shall deem most effectual to enforce any of its rights or the rights of the holders of the Bonds....
 
 
 59
 Supply System Board of Directors Bond Resolution No. 890, § 11.4 (adopted Feb. 23, 1977) ("Supply System Bond Resolution"). The district court held that "Chemical Bank reasonably and prudently exercised the discretion and authority vested in it by § 11.4 of the Bond Resolution" in agreeing to the binding anti-suit injunctions. 720 F.Supp. at 1423.
 
 
 60
 In addition to imbuing Chemical Bank with authority to bring suits at law or in equity for the collection of all sums due in connection with the Bonds, section 11.4 specifically provides Chemical Bank with authority to:
 
 
 61
 enforce its rights and the rights of the holders of the Bonds under the Resolution ... in the enforcement of any other legal or equitable rights as the Bond Fund Trustee, being advised by counsel, shall deem most effectual to enforce any of its rights or the rights of the holders of the Bonds....
 
 
 62
 Supply System Bond Resolution, supra, § 11.4 (emphasis added). We conclude that § 11.4 vests in Chemical Bank the authority to bring tort and fraud claims on behalf of the Bondholders.[8] We therefore reject the Heerey Group's contention that the Bond Resolution only entitles Chemical Bank to bring suit for claims on the bond.
 
 
 63
 The Heerey Group argues that even if Chemical Bank was entitled to bring fraud and tort claims, the Bond Resolution expressly prohibits the Bank from compromising these claims without the Bondholders' consent. Support for this assertion can only be found in the plain language of the Bond Resolution. Therefore we focus our consideration of the Heerey Group's arguments concerning the alleged prohibitions of the Bond Resolution on its express terms.
 
 
 64
 The Heerey Group contends that section 11.4 of the Bond Resolution, which provides that in certain types of proceedings, Bondholder consent is required before Chemical Bank may waive or change "any right of any holder of Bonds," explicitly circumscribes Chemical Bank's authority to compromise its members claims without their consent. Noting that the proceedings covered include "equity, receivership, insolvency, bankruptcy, liquidation, readjustment, reorganization or other ... proceedings," the Heerey Group asserts that their claims would be "liquidated" and "readjusted" by the preclusive effect of the anti-suit injunctions and therefore consent of its members was necessary.
 
 
 65
 We find this contention to be meritless. The proceedings mentioned in section 11.4 refer to specific forms of judicial proceedings that have no relation to this litigation. Liquidations involve the process of reducing a corporation's assets to cash in order to discharge its liabilities. 16A Fletcher Cyclopedia of the Law of Private Corporations § 7968, at 14 (rev. perm. ed. 1988); Black's Law Dictionary 931 (6th ed. 1990). Readjustments involve the voluntary reorganization of a corporation which is in financial difficulty. Black's Law Dictionary, supra, at 1263. The Heerey Group's attempt to compare the effect of the anti-suit injunctions with these forms of proceedings on the ground that their claims will be "liquidated" and "readjusted" tortures the meaning of these words and is unpersuasive.
 
 
 66
 The Heerey Group next argues that section 11.5 of the Bond Resolution circumscribes Chemical Bank's powers to compromise its members' claims without their consent. Section 11.5 reads in pertinent part:
 
 
 67
 Nothing in the Resolution or in the Bonds or in the coupons contained shall ... affect or impair the rights of action, which are ... absolute and unconditional, of any holder to enforce the payment of his Bonds, or to reduce to judgment his claim against the System for the payment of the principal and interest on his Bonds, without reference to, or consent of, the Bond Fund Trustee or any other holder of Bonds.
 
 
 68
 Supply System Bond Resolution, supra, § 11.5. The Heerey Group asserts that this section expressly preserves the rights of the Bondholders to reject any settlement of their claims on the bond against WPPSS that they believe is inadequate.
 
 
 69
 We do not read section 11.5 so strictly. While section 11.5 does affirmatively grant to individual Bondholders the "absolute and unconditional right" to bring claims against WPPSS for payments on their bonds without needing the consent of Chemical Bank or other Bondholders, we do not construe this language to take away from Chemical Bank the power to settle or compromise Bondholders' claims against WPPSS, in performance of its duties under section 11.4 to bring suit for all sums due in connection with the bonds, on the ground that the Bank has not obtained universal Bondholder consent. Such a reading of section 11.5 would allow a single dissenting Bondholder, by withholding consent, to deny Chemical Bank the ability to universally settle or compromise Bondholders' claims against WPPSS as a whole, an interpretation which we find to be incongruous. Moreover, to the extent the anti-suit injunctions "affect" or "impair" the potential actions of the Bondholders against WPPSS, it is not a result of "the Resolution or the Bonds or the coupons contained therein" as prohibited by section 11.5; rather, it is a result of Chemical Bank's discretionary decision to enter into settlement agreements which include the authority to issue the binding injunctions. Moreover, we find nothing in the language of sections 11.6 and 11.7 that would require individual Bondholders' consent before Chemical Bank entered into the anti-suit injunctions.
 
 
 70
 The Heerey Group contends, however, that even if the Bond Resolution does not expressly circumscribe Chemical Bank's authority to compromise its members' claims, it does not expressly imbue Chemical Bank with this authority either. The Heerey Group asserts that section 11.4 of the Bond Resolution only authorizes Chemical Bank to bring suit on behalf of the Bondholders, but does not entitle the Bank to compromise Bondholders' claims without their consent.
 
 
 71
 We disagree. The Bond Resolution's choice of law clause, section 14.11, provides in pertinent part:
 
 
 72
 to the extent not prohibited by the laws of the State of Washington, the Bond Fund Trustee's immunities and the standard of care in performance of its duties, obligations and responsibilities ... shall be construed in accordance with and governed by the laws of the state in which the Bond Fund Trustee maintains its principal office.
 
 
 73
 Bond Resolution No. 911, § 14.11 (adopted April 22, 1977). Hence, Chemical Bank's standard of care in the performance of its duties, responsibilities, and obligations under the Resolution, including the question of Chemical Bank's authority to compromise Bondholders' claims, are governed by the laws of the state in which Chemical Bank maintains its principal office, provided that such law is not inconsistent with the laws of the State of Washington.
 
 
 74
 Chemical Bank's principal office is in the State of New York. New York statutory law provides that in the absence of contrary provisions in the trust indenture, a trustee may "contest, compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary." N.Y.Est.Powers & Trusts Law § 11-1.1(b)(13) (McKinney's 1988) (emphasis added).[9] The law of the State of Washington is consistent providing that "[a] trustee ... in addition to the authority otherwise given by law, [has] discretionary power to ... [c]ompromise or submit claims to arbitration[.]" Wash.Rev.Code § 11.98.070(11) (1987). The common law also is in agreement. See Restatement (Second) of Trusts § 192 (1959) ("The trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property, provided that in so doing he exercises reasonable prudence."). We hold that in the absence of any express language in the Bond Resolution to the contrary, Chemical Bank was authorized to settle or compromise Bondholders' claims under the laws of the States of New York and Washington as provided for by section 14.11 of the Bond Resolution.
 
 
 75
 Lastly, the Heerey Group contends that there is no evidence that its members ever saw, let alone read, the Bond Resolution, and that even if they did, they did not intend to waive their jurisdictional defenses merely by acquiring their bonds. We reject this contention as well. Section 14.1 of the Bond Resolution states in pertinent part:
 
 
 76
 In consideration of the purchase and acceptance of the Bonds by those who shall hold the same from time to time, the provisions of the Resolution and of said laws shall constitute a contract with the holder or holders of each Bond and coupon pertaining thereto....
 
 
 77
 Supply System Bond Resolution, supra, § 14.1 (emphasis added). The Bond Resolution is a binding contract between Chemical Bank as Bond Fund Trustee and the Bondholders.
 
 
 78
 Accordingly, we conclude that Chemical Bank was authorized under the terms of the Bond Resolution and applicable New York and Washington state law to consent to the binding anti-suit injunctions provided for in the settlement agreements.
 
 
 79
 b. Adequacy of Chemical Bank's Representation
 
 
 80
 The Heerey Group contends that in adopting a strategy of recovery that sought maximum settlements or judgments, Chemical Bank sacrificed the interests of late-purchasing Bondholders in favor of those Bondholders who were also MDL 551 Class Members. Thus, the Heerey Group argues its members cannot be bound by the anti-suit injunctions even if they were represented by and privies with the Bank in MDL 551. We review the district court's factual determination that Chemical Bank adequately represented the interests of all Bondholders under the clearly erroneous standard. Fed.R.Civ.P. 52(a); Kruso v. International Tel. and Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).
 
 
 81
 A trustee will not be disabled from binding the trust beneficiaries to a judgment unless there is fraud or collusion between the representative and the adverse party. Kerrison, 93 U.S. at 160; Truckee-Carson Irrigation Dist., 649 F.2d at 1304 n. 13. More specifically, the Restatement provides in relevant part that:
 
 
 82
 (1) A person is not bound by a judgment for or against a party who purports to represent him if:
 
 
 83
 ....
 
 
 84
 (d) With respect to the representative of a class, there was such a substantial divergence of interest between him and the members of the class, or a group within the class, that he could not fairly represent them with respect to the matters as to which the judgment is subsequently invoked; or
 
 
 85
 (e) The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.
 
 
 86
 ....
 
 
 87
 Restatement (Second) of Judgments § 42 (1982).
 
 
 88
 Relying on section 42(1)(d), the Heerey Group contends that from the outset of MDL 551, there was a sharp divergence of interests between those Bondholders who were also MDL 551 Class Members and those Bondholders who purchased their bonds outside the class boundary date. Bondholders who were MDL 551 Class Members sought maximum settlements or judgments and were not concerned with theories of recovery or the allocation of the proceeds between the class and the Bond Fund because as members of both groups, they would be entitled to recover and possibly would be able to "double dip" from any settlement or judgment. Late-purchasing Bondholders, on the other hand, were not members of both groups and thus were critically concerned with theories of recovery and the allocation of the proceeds between the class and the Bond Fund. The Heerey Group charges that Chemical Bank adopted the strategy of attempting to secure the maximum settlements possible, thereby sacrificing the interests of its members in favor of those Bondholders who were also MDL 551 Class Members. In so doing, the Heerey Group contends Chemical Bank violated its fiduciary duty to further the interests of each Bondholder.
 
 
 89
 We find no merit in this contention. The Heerey Group's argument that Chemical Bank sacrificed the interests of its members in favor of MDL 551 Class Members simply finds no support in the record. Chemical Bank advanced before the district court the theory of recovery most critical to the interests of the Heerey Group; namely, that as late-purchasing Bondholders they received an automatic assignment of the fraud and tort claims held by their predecessors. The theory was opposed by the MDL 551 Class Members, who maintained that the original bond purchasers retained these fraud and tort claims. On December 22, 1987, the district court agreed with the MDL 551 Class Members and dismissed all federal and state claims Bondholders based solely on the theory of automatic assignment. A motion for reconsideration was filed by the law firm of Patterson, Belknap, Webb & Tyler, who had been retained as special counsel by Chemical Bank for the express purpose of protecting the interests of late-purchasing Bondholders.[10] The district court refused to reconsider its ruling. We find that Chemical Bank's actions in advancing this critical theory before the district court, a theory contrary to the interests of and opposed by the MDL 551 Class Members, demonstrate the fairness of Chemical Bank's representation of the Heerey Group. Although it was not successful in prosecuting this theory, the district court specifically noted in considering the question of the adequacy of Chemical Bank's representation that "[t]he record shows, and the Court readily acknowledges, that Chemical Bank vigorously opposed that result, both before and after it was reached." In re Washington Public Power, 720 F.Supp. at 1421. We find nothing in the record that would call into question this finding. We therefore conclude that the record does not support the Heerey Group's contention that Chemical Bank sacrificed its members' interests in favor of those Bondholders who were also MDL 551 Class Members.
 
 
 90
 Finally, with respect to section 42(1)(e) of the Restatement, the Heerey Group raises several issues which it claims demonstrate Chemical Bank's failure to defend the action with due diligence and reasonable prudence. We find none of these issues compelling, especially in light of the adequacy of the allocation of settlement to the members of the Heerey Group. See In re Corrugated Container Antitrust Litig., 659 F.2d 1337, 1340 (5th Cir.1981) ("[T]he proof of adequate representation is in the adequacy of the settlements."). Here, the district court had dismissed all claims based on the theory that late-purchasing Bondholders received an automatic assignment of the fraud and tort claims. In addition, the district court had dismissed all contract and securities-based claims that WPPSS was the "alter ego" of its members, and therefore that the Participants were liable for the obligations of WPPSS. As the district court noted, "[t]he effect of these decisions was to eliminate significant bases for the claims of Bondholders who purchased bonds after June 15, 1983." In re Washington Public Power, 720 F.Supp. at 1421. Nonetheless, the late-purchasing Bondholders received an allocation of $93.5 million from the Bond Fund plus an additional $47 million in repayment of expenses advanced from the Bond Fund. In light of these favorable settlements, and in the absence of any compelling evidence to the contrary, we hold that the Heerey Group has not made a showing that Chemical Bank failed to act with due diligence and reasonable prudence in representing the interests of the Bondholders.
 
 
 91
 c. Conclusion
 
 
 92
 We conclude that Chemical Bank was authorized under the Bond Resolution to compromise Bondholders' claims and that the Bank adequately represented the interests of the Bondholders it represented, including the members of the Heerey Group. We therefore hold that the district court properly exercised jurisdiction and authority to approve the agreement to the anti-suit injunctions under the common law exception to the general rule of prior adjudication.[11]
 
 C. Challenges to the Allocation Plan
 
 93
 The Heerey Group lastly challenges the district court's approval of the Allocation Plan. We review the district court's approval of the Allocation Plan for an abuse of discretion. Officers for Justice, 688 F.2d at 625-626.
 
 
 94
 The Heerey Group's contentions concerning the Allocation Plan do not directly challenge the district court's conclusion that the Allocation Plan was fair, reasonable, and adequate. Rather, the Heerey Group in essence is attempting to reargue the issues of whether Chemical Bank sacrificed its members' interests in favor of those Bondholders who were also MDL 551 Class Members and whether its members acquired the fraud and tort claims of their predecessor Bondholders. We find these challenges to be meritless. As we have held above, Chemical Bank advanced the theory of recovery most critical to the interests of the Heerey Group's members, a theory that was contrary to the interests of and opposed by the MDL 551 Class Members. Although it was unsuccessful in bringing this claim, the record supports the district court's finding that Chemical Bank opposed this result both before and after it was reached. Similarly, the district court's conclusion that late-purchasing Bondholders did not receive an automatic assignment of the fraud and tort claims of their predecessor Bondholders was based on governing Ninth Circuit authority.
 
 
 95
 In In re Nucorp Energy Sec. Litig., 772 F.2d 1486 (9th Cir.1985), we held that purchasers of securities did not receive an automatic assignment of the fraud and tort claims of their predecessors under either federal or state law. Id. at 1490, 1492-93. Although the Heerey Group contends that this case was wrongly decided and incorrectly interpreted New York state law, it is well established that we may reconsider earlier Ninth Circuit precedent only by en banc review or after an intervening Supreme Court decision. See Landreth v. C.I.R., 859 F.2d 643, 648 (9th Cir.1988). Accordingly, for the reasons set forth above, we reject the Heerey Group's challenges to the Allocation Plan.
 
 III. Challenges of the Lehmann Group
 
 96
 Intervenor/Appellant C. Richard Lehmann (the "Lehmann Group") is composed of C. Richard Lehmann, a late-purchasing Bondholder,[12] and the Bond Investors Association ("Bond Investors"). Lehmann, the President of Bond Investors, alleges that this organization is a non-profit corporation formed in 1984 to support bondholders in default proceedings. Lehmann claims that Bond Investors is supported by contributions from its upward of 14,000 members and that it publishes a monthly newsletter on defaulted bonds. Lehmann also asserts that Bond Investors includes many MDL 551 Class Members and that it represents their interests here.
 
 
 97
 The Lehmann Group appeals from the district court's order and judgment approving the settlement agreements between all parties as well as from the order approving the Allocation Plan. Lehmann appeals pro se as a Bondholder and also as President of Bond Investors, allegedly on behalf of its numerous MDL 551 Class Members. The Lehmann Group challenges the fairness of the settlement reached with WPPSS, BPA, and the State of Washington. Bond Investors also appeals the order approving the Allocation Plan.
 
 A. Standing
 
 98
 We must first consider whether the Lehmann Group has standing. As we noted above with respect to the Heerey Group, a non-party who is enjoined or otherwise directly aggrieved by a judgment has standing to appeal that judgment without having intervened in the district court. Hal Roach Studios, 896 F.2d at 1546-47. Because the judgment enjoins Lehmann from bringing parallel actions against the settling defendants, Lehmann has standing to appeal in his own behalf as a Bondholder.
 
 
 99
 The question of whether Bond Investors has standing to appeal on behalf of the numerous MDL 551 Class Members it claims to represent is more troublesome. In Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court set forth the following test for organizational standing:
 
 
 100
 [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 101
 Id. at 343, 97 S.Ct. at 2441. "Each of the three Hunt requirements must be met by a litigant asserting associational standing." Bahnmiller v. Derwinski, 923 F.2d 1085, 1089 n. 3 (4th Cir.1991).
 
 
 102
 There has been no showing with respect to the second prong of the Hunt test, which requires that the interests the group seeks to protect are germane to its organizational purpose. The record before us is barren of any evidence concerning Bond Investors' organizational purpose or of the grounds which bring its membership together beyond the bald assertions set forth in the Lehmann Group's brief. No certificate of incorporation, organizational constitution, or other relevant material has been introduced. Although the Lehmann Group claims that Bond Investors surveyed over 1000 Class Members and Bondholders concerning the fairness of the proposed settlements, of whom 99% responded negatively, this information cannot substitute for relevant material that would describe the organizational purpose of Bond Investors. In the absence of any such relevant evidence, it is impossible for us to conclude that the interests Bond Investors seek to protect are germane to its organizational purpose.[13] See Bahnmiller, 923 F.2d at 1089 n. 3 (organization failed second prong of Hunt test because record was "devoid of any evidence" that the subject which organization sought to protect was germane to its organization purpose). We therefore hold that Bond Investors lacks standing to appeal on behalf of the MDL 551 Class Members it claims to represent.
 
 
 103
 B. Lehmann's Challenges to the Settlement Agreements
 
 
 104
 Lehmann, in his individual capacity, specifically challenges the settlement agreements. He contends Chemical Bank made "needless concessions" to defendants WPPSS, BPA, and the State of Washington and that the accompanying settlement agreements should therefore be rejected. Lehmann does not, however, challenge the authority of Chemical Bank to act on his behalf as a Bondholder nor does he specifically challenge the adequacy of Chemical Bank's representation. In the absence of a challenge to the authority or adequacy of Chemical Bank's representation, we find Lehmann's contentions to be meritless.
 
 IV. Challenges of the Hoffer Group
 
 105
 The Hoffer Group is the certified class representative in a pending Washington state court certified class action. That class action, Hoffer v. State, Civ. No. 84-2-16459-0 (Sup.Ct. King Co., Wash.) ("Hoffer "), alleges numerous claims against the State of Washington and certain officials and instrumentalities thereof in connection with the WPPSS Projects 4/5 bond default. The class in Hoffer is identical to the MDL 551 Class.
 
 
 106
 The Hoffer Group appeals from the order and judgment approving the settlement agreements. Specifically, the Hoffer Group challenges a consolidated settlement agreement ("Consolidated Settlement") reached between the MDL 551 plaintiffs and the Washington Public Utilities Group; Public Utility District No. 1 of Klickitat County; Public Utility District No. 1 of Franklin County; the Snohomish Public Utility District; the United States of America on behalf of itself and its agency, BPA; and the State of Washington (collectively the "WPUG Defendants"). The Consolidated Settlement releases the State of Washington from the claims asserted against it in Hoffer. The Hoffer Group contends the district court lacked jurisdiction and authority to approve the Consolidated Settlement. They also contend that the Settlement should be rejected because it is unfair, unjust, and inadequate.
 
 
 107
 This appeal presents fundamental questions of first impression involving the extent to which a plaintiff class in a federal action can settle claims that have not been alleged in the complaint and that are pending in a state court as part of a certified state class action. No reported case has decided this precise issue.
 
 
 108
 A. Background of Hoffer and the Consolidated Settlement
 
 
 109
 The Hoffer litigation was commenced in the Superior Court of the State of Washington. The Hoffer plaintiffs originally alleged twelve causes of action against the State and certain officials and instrumentalities thereof, including common law fraud, violations of the Washington State Securities Act, negligent misrepresentation, tortious interference with a business expectancy, and others. Hoffer was certified as a class action with respect to the claims against the State. The Superior Court dismissed all claims against the State for failure to state a cause of action upon which relief could be granted. The Washington Supreme Court reversed, holding that the complaint was sufficient to state eight causes of action upon which relief could be granted. Hoffer v. State, 110 Wash.2d 415, 755 P.2d 781 (1988), aff'd on reh'g, 113 Wash.2d 148, 776 P.2d 963 (1989). The case was remanded to the State Superior Court.
 
 
 110
 While Hoffer was pending, the MDL 551 plaintiffs and WPUG Defendants reached preliminary agreements concerning a possible settlement. The preliminary agreements purported to release the State of Washington from the claims asserted against it in Hoffer notwithstanding the fact that the State was not a party to MDL 551. A memorandum of understanding was filed with the district court on November 1, 1988, and the final Consolidated Settlement was filed with the district court on April 6, 1989.
 
 
 111
 The Consolidated Settlement called for payments by the WPUG Defendants of roughly $275 million into the Settlement Fund. Included in the payment was a $10 million contribution from the State in exchange for release of the MDL 551 plaintiffs' claims in Hoffer.
 
 B. Challenges to the Settlement Agreements
 
 112
 1. Jurisdiction and Authority of the District Court To Approve the Settlement Agreements
 
 
 113
 The Hoffer Group contends the district court lacked subject matter jurisdiction to approve the Consolidated Settlement. Noting that only state law claims for money damages have been asserted against the State in Hoffer, the Hoffer Group argues that the district court had no independent basis for exercising jurisdiction over those claims, nor was it empowered to exercise pendent party jurisdiction. See Finley v. United States, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). We review de novo the district court's determination that it had jurisdiction to approve the Consolidated Settlement. Persons, 925 F.2d at 294.
 
 
 114
 We disagree. It is elementary that the validity of an order of a federal court depends upon that court's having jurisdiction over the subject matter of the action and the parties. Insurance Corp. of Ireland, 456 U.S. at 701, 102 S.Ct. at 2103; Stoll v. Gottlieb, 305 U.S. 165, 171-72, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938). The plaintiff Class in MDL 551, which is identical to the class in Hoffer, simply sought the district court's approval of a settlement that released the State from the claims asserted in Hoffer. The weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim "based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 460 (2d Cir.1982) (emphasis added). See also In re Corrugated Container Antitrust Litig., 643 F.2d at 221 ("[E]ven when the court does not have power to adjudicate a claim, it may still 'approve release of that claim as a condition of settlement of [an] action [before it.]' " (citation omitted)). Thus, in Officers for Justice, we noted that "where a particular type of relief potentially available to the class members is compromised in the settlement process, it is mainly irrelevant whether or not that relief was specifically requested in the complaint. The breadth of negotiations is not necessarily strictly confined by the pleadings." 688 F.2d at 632 n. 18 (emphasis added). Similarly, other circuits have held that a state court was within its power to approve the release of a federal claim, which could not have been brought in the state court. Nottingham Partners v. Trans-Lux Corp., 925 F.2d 29, 33-34 (1st Cir.1991); Abramson v. Pennwood Inv. Corp., 392 F.2d 759, 762 (2d Cir.1968). Here, the claims asserted against the State in Hoffer arise from the same common nucleus of operative fact as those set forth in MDL 551. Accordingly, we conclude that it was not necessary for the district court to actually exercise subject matter jurisdiction over the claims to approve their release.
 
 
 115
 The Hoffer Group's objection to this analysis is threefold. The Hoffer Group first insists that the cases which allow a federal court to release claims not before it are limited to situations in which a defendant was released from claims not alleged in the complaint but which arose from the same facts as those set forth in the complaint. Here, because the State was not a party to MDL 551, the Hoffer Group maintains that the MDL 551 Class Plaintiffs had no authority to enter into, and the district court had no jurisdiction to approve, a settlement agreement which purports to release the claims asserted against the State. Next, the Hoffer Group claims that the State could not have been a defendant in MDL 551 due to the bar of the Eleventh Amendment.[14] The Hoffer Group contends that the district court's approval of the Consolidated Settlement is flawed for the additional reason that the court had no power to release claims against a party over which it had no jurisdiction. Finally, the Hoffer Group challenges the district court's finding that the State of Washington made a limited waiver of its Eleventh Amendment immunity in the context of the settlement proceedings. The Hoffer Group contends that once the State interposed its Eleventh Amendment immunity as it has done in MDL 551, it could not then selectively waive immunity for the limited purpose of extinguishing the state law claims.
 
 
 116
 The district court rejected these contentions based on its conclusion that the State had made a limited waiver of immunity for the purpose of the settlement proceedings. In pertinent part, the district court held that:
 
 
 117
 Counsel for the State of Washington ... have taken part in settlement negotiations, entered into the Consolidated Settlement agreement, prepared and submitted to this Court memoranda in support of its participation in this Consolidated Settlement, and appeared before this Court to urge and defend the Court's approval of the settlement.... These actions unequivocally indicate the State's consent to this federal court's jurisdiction over this aspect of its litigation. Thus, insofar as the Court's approval of the settlement agreement between the Class Plaintiffs and the State of Washington is concerned, and despite the Court's lack of power otherwise to adjudicate these claims, a limited waiver of the State's Eleventh Amendment immunity is deemed to have occurred in the context of this litigation.
 
 
 118
 In re Washington Public Power, 720 F.Supp. at 1413-14.
 
 
 119
 We agree with the district court. The Eleventh Amendment's bar to actions against states by its own citizens in federal court is not absolute; a state may waive its immunity and consent to suit in federal court by giving an "unequivocal indication" that it consents to suit in federal court. Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 and n. 1, 105 S.Ct. 3142, 3145 and n. 1, 87 L.Ed.2d 171 (1985); Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360-61, 39 L.Ed.2d 662 (1974).
 
 
 120
 The United States District Court for the District of Kansas has expressly followed the district court's lead and held that states may make limited waivers of their Eleventh Amendment immunity in the context of settlement proceedings. See In re the Department of Energy Stripper Well Exemption Litig., 763 F.Supp. 498, 504 (D.Kan.1991) (State of New Mexico had waived its Eleventh Amendment immunity only with respect to the settlement aspect of the litigation). With these principles in mind, we find no legal impediment to a state's waiver of its Eleventh Amendment immunity for the limited purpose of taking part in the settlement proceedings despite otherwise interposing immunity. If we were to adopt a contrary conclusion, states could effectively be forced to refrain from participating in settlement negotiations for fear that they may thereby be waiving their Eleventh Amendment immunity, a result that is inconsistent with the strong judicial policy in favor of settlements. See, e.g., Officers for Justice, 688 F.2d at 625; In re Corrugated Container Antitrust Litig., 643 F.2d at 207. Accordingly, we reject the Hoffer Group's contentions that the district court should not have approved the Consolidated Settlement because the State was not and could not have been a party to this action.
 
 
 121
 We also reject the Hoffer Group's contention that the district court's approval of the release of the claims asserted against the State violates the Anti-Injunction Act, 28 U.S.C. § 2283. As we have noted above with respect to the appeals of the Heerey Group, the relitigation exception to the Anti-Injunction Act allows a federal court to enjoin a state court proceeding to protect or effectuate its judgment.
 
 
 122
 Nor is the district court's approval of the Consolidated Settlement flawed because it did not require that members of the class be afforded an opportunity to opt out of the resulting settlement. Fed.R.Civ.P. 23 does not require that class members be given an opportunity to opt out of a proposed settlement when the settlement includes claims not originally set forth in the class complaint. Rule 23(c)(2) requires that class members be given notice of and opportunity to opt out of a class action maintained under Rule 23(b)(3). Rule 23(e) states that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed.R.Civ.P. 23(e) (emphasis added). Finally, Rule 23(d)(2), which sets forth guidelines "for the protection of the members of the class or otherwise for the fair conduct of the action," does not require that class members be afforded the opportunity to opt out of a settlement that includes claims that were not alleged in the complaint. Fed.R.Civ.P. 23(d)(2).
 
 
 123
 Here, the MDL 551 Class Members were given notice of the action and afforded an opportunity to opt out. The MDL 551 Class Members also were given notice of the proposed settlement and afforded the opportunity to object. This is all that Rule 23 requires. The Second Circuit's decision in Weinberger v. Kendrick, 698 F.2d 61 (2nd Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), and the Fifth Circuit's decision in In re Corrugated Container Antitrust Litig. are not to the contrary. The courts in those cases simply held that because the classes there were given notice of the addition of claims not alleged in the class complaint before they had to decide whether to opt out of the class, a federal court was within its power to release these claims not before it as a condition of settlement. See Weinberger, 698 F.2d at 77; In re Corrugated Container Antitrust Litig., 643 F.2d at 221. Neither court required that members be afforded an additional opportunity to opt out of a proposed settlement when that settlement includes a claim that was not set forth in the complaint.
 
 
 124
 Additionally, we hold that the district court's approval of the Consolidated Settlement did not violate basic principles of comity. The district court's approval of the Consolidated Settlement in no way interfered with or intruded into the authority of the Washington state courts. The district court did not adjudicate the claims on the merits. Rather, the district court was presented with a settlement agreement that, through counsel properly before the court, proposed resolution of claims of persons that also were properly before the court.
 
 
 125
 Finally, the Hoffer Group contends that the settlement was not the product of arm's length negotiations because the MDL 551 class did not negotiate directly with the State. In addition, the Hoffer Group maintains that the complete exclusion of the Hoffer Class Counsel from the settlement process also calls for rejection of the settlement.
 
 
 126
 "Before approving a class action settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties...." Ficalora v. Lockheed Cal. Co., 751 F.2d 995, 997 (9th Cir.1985) (citing Officers for Justice, 688 F.2d at 625). Here, the district court found "no suggestion of collusion between Class Plaintiffs and any of [the] settling parties...." In re Washington Public Power, 720 F.Supp. at 1415. Although noting that the negotiation process that led up to the State's participation in the Consolidated Settlement was unusual, the district court determined that "[b]ased upon all information available, including depositions of the three primary negotiating parties, this Court is convinced that the discussion process that resulted in the Consolidated Settlement Agreement was not unlawfully tainted." Id. We review the district court's conclusion that the settlement process was not fatally flawed for an abuse of discretion. Officers for Justice, 688 F.2d at 626.
 
 
 127
 At the time MDL 551 came to trial in September 1988, MDL 551 Class Counsel was involved in settlement negotiations with the lead counsel for the WPUG Defendants. After an initial figure of $300 million had been proposed by MDL 551 Class Counsel, the parties arrived at a settlement figure of $275 million. The WPUG Defendants were not able to meet the figure. The WPUG Defendants, however, had had previous discussions with the State of Washington and BPA concerning contributions from these entities in return for a release of the claims against them. The WPUG Defendants inquired of MDL 551 Class Counsel whether they would release the MDL 551 Class's claims against the State and BPA if these entities would contribute to a settlement that would meet the $275 million target. MDL 551 Class Counsel agreed to this approach. After discussion with the State and BPA, the WPUG Defendants then returned with a settlement offer of $275 million that included contributions of $35 million from BPA and $10 million from the State in return for the Class's release of their claims against these entities. The MDL 551 Class Counsel accepted.
 
 
 128
 MDL 551 Class Counsel negotiated vigorously with the WPUG Defendants. In so doing, MDL 551 Class Counsel made the calculated decision to allow the WPUG Defendants to approach the State of Washington and BPA concerning possible contributions to the settlement in return for releases from the Class of their claims against these entities. It is thus immaterial whether MDL 551 Class Counsel negotiated directly with the State; MDL 551 Class Counsel had agreed in its negotiations with the WPUG Defendants to allow this group's counsel to negotiate with the State and BPA for contributions to the potential settlement so long as a final settlement figure of $275 million was reached. There is no suggestion, as the district court noted, that this decision on the part of MDL 551 Class Counsel was made as a result of collusion with any of the settling parties. We therefore reject the Hoffer Group's contention that the Consolidated Settlement was fatally flawed by the lack of negotiations between the MDL 551 Class Counsel and the State.
 
 
 129
 Nor do we find that the Consolidated Settlement was fatally flawed by the exclusion of Hoffer Class Counsel from the settlement process. The Seventh Circuit's decision in In re General Motors Corp. Engine Interchange Litig., 594 F.2d 1106 (7th Cir.), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), does not alter this conclusion. In In re General Motors Corp., the Seventh Circuit considered a case in which a settlement had been negotiated by the Assistant Attorney General of Illinois, only one member of a six member class counsel executive committee. The Seventh Circuit found that this undertaking either violated a prior pretrial order in the case that required consent by all class counsel before settlement negotiations could be initiated, or indicated that the negotiations undertaken by the Attorney General's office was done in a capacity other than as class counsel in the action in question. Id. at 1126. In either circumstance, the Seventh Circuit found that the exclusion of the remaining class counsel indicated that only some of the plaintiff class had been represented in the negotiations, raising the possibility that the interests of some members of the class had been sacrificed for the benefit of other members. Id. at 1126-29.
 
 
 130
 Here, in contrast, MDL 551 Class Counsel who negotiated the Consolidated Settlement represented the exact same group of individuals who make up the Hoffer class. MDL 551 Class Counsel was intimately familiar with the facts and law surrounding the Projects 4/5 bond default. Thus, there can be no suggestion that MDL 551 Class Counsel sacrificed the interests of some members of the class in favor of others. The district court did not abuse its discretion in rejecting this contention.
 
 
 131
 2. Fairness, Adequacy, and Reasonableness of the Consolidated Settlement
 
 
 132
 Characterizing the State's contribution of $10 million as being of only "nuisance value," the Hoffer Group maintains that the district court made a number of fundamental errors in reaching the conclusion that the State's contribution was fair, adequate, and reasonable.
 
 
 133
 We have set forth previously the standards for approval of a class action settlement. The initial decision to approve or reject the settlement under Fed.R.Civ.P. 23(e) is committed to the sound discretion of the trial judge. Officers for Justice, 688 F.2d at 625. The district court must determine whether the proposed settlement, taken as a whole, is fair, adequate, and reasonable. In re Cement and Concrete Antitrust Litig., 817 F.2d 1435, 1438 (9th Cir.1987); Officers for Justice, 688 F.2d at 625. The court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." Officers for Justice, 688 F.2d at 625. The district court's ultimate determination will involve a balancing of several factors. These factors, set forth by this court previously in Officers for Justice, may include:
 
 
 134
 the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.
 
 
 135
 Id. The relative importance to be attached to any particular factor will depend upon the nature of the claims, the types of relief sought, and the unique facts and circumstances presented by the individual case. Id.
 
 
 136
 Great weight is accorded to the district judge's views because "he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir.1971). Our task on appeal therefore is a very limited one. "We are not to substitute our notions of fairness for those of the district judge and the parties to the agreement.... [W]e will reverse only upon a strong showing that the district court's decision was a clear abuse of discretion." Officers for Justice, 688 F.2d at 626 (citations omitted).
 
 
 137
 The district court, upon applying the factors set forth in Officers for Justice, concluded that the State's contribution to the Consolidated Settlement was fair, adequate, and reasonable. The district court reasoned that the claims asserted against the State in Hoffer rely on "a number of tenuous and untried hypotheses that would require, among other things, survival of uncertain claims and favorable legal decisions throughout." In re Washington Public Power, 720 F.Supp. at 1416. For example, the district court noted that the Hoffer Group's allegations of misrepresentation made against the State faced many legal obstacles similar to those faced by the MDL 551 Class Members, such as proof of scienter. The Hoffer Group's claim under § 21.20.430 of the Washington State Securities Act also would be "at risk because of developments in the law during the period of this litigation that threatened to restrict the Act's applicability and necessitate proof of scienter." Id. at 1388. The district court next observed that the Hoffer Group's claims against the State had only survived a motion for dismissal under Washington Rule CR 12(b)(6), and that the merits of the claims had not been subjected to motions for summary judgment or to trial. Id. at 1416. Extensive discovery had not been conducted. In addition, the district court found that the risks, expenses, and difficulties associated with further litigation of Hoffer would be enormous. At the very minimum, it was reasonable to assume that it would be a number of years before any judgment or separate settlement would be reached. The district court noted any total damage award for the torts alleged in Hoffer would be subject to reduction for damages found to have been caused by the MDL 551 Defendants. Id. In rejecting the Hoffer Group's argument that the State's $10 million contribution was a mere "nuisance" payment, the court concluded that "[o]n the facts and information before it, the amount appears to be fully adequate, and the Court finds the terms of the Consolidated Settlement Agreement that apply to the State to be fair and reasonable to Class Plaintiffs in accordance with the mandate of Fed.R.Civ.P. 23." Id. at 1417.
 
 
 138
 We believe it is appropriate to note that the complexity, duration, and sheer enormity of MDL 551 weighs heavily against a conclusion that the district court abused its discretion in approving the Consolidated Settlement. See Officers for Justice, 688 F.2d at 626 (making similar finding). The case had been aggressively litigated before Judge Browning for more than three years. Multiple motions to dismiss or for summary judgment had been argued and considered. Discovery was comprehensive. The Consolidated Settlement that is before us was not hastily arrived at; trial in MDL 551 had already begun and had proceeded for nearly three months. Notice of the Consolidated Settlement was provided to all known Projects 4/5 Bondholders through an extensive mail and publication program, and the MDL 551 Class Members were informed of their rights to object to the proposed settlement at the Fairness Hearings. Each objection raised was considered and responded to by the district court. In light of these factors, as was the case in Officers for Justice, "we would be hard pressed to find an abuse of discretion." Id. at 627.
 
 
 139
 a. Separate Evaluation
 
 
 140
 The Hoffer Group argues that the district court erred by not evaluating the State's contribution to the Consolidated Settlement on its own merits. It asserts the district court instead improperly evaluated the Consolidated Settlement as a whole and determined comprehensively whether it was fair, adequate, and reasonable, when under the terms of Consolidated Settlement, the State's contribution was severable on its face.
 
 
 141
 Our review of the district court's order and judgment convinces us that the court separately considered the fairness, adequacy, and reasonableness of the State's contribution. See In re Washington Public Power, 720 F.Supp. at 1417 ("[T]he Court finds the terms of the Consolidated Settlement Agreement that apply to the State to be fair and reasonable to Class Plaintiffs in accordance with the mandate of Fed.R.Civ.P. 23." (emphasis added).[15] It therefore is immaterial whether the district court assumed that the State's contribution was not severable from the body of the Consolidated Settlement; because the district court separately evaluated the State's contribution, its conclusion that the State's contribution was fair, adequate, and reasonable was not dependent on this allegedly mistaken assumption.
 
 
 142
 b. Deficient Notice
 
 
 143
 The Hoffer Group also contends the district court erred by determining that the Notice of Settlement provided the MDL 551 Class Members with a clear and adequate disclosure of the proposed release of the claims asserted against the State in Hoffer. We disagree. As the district court stated, "the Notice contained a description of the Hoffer action and an explanation that approval of the proposed settlement would mean that 'all Class Members shall be deemed to have released the State and its elected and appointed officials [ ] from any and all liability arising out of occurrences which are the subject of MDL 551 or Related Actions ... including Hoffer et al. v. State of Washington.' " In re Washington Public Power, 720 F.Supp. at 1412-13 (quoting Class Notice). In addition, the Notice specifically advised the MDL 551 Class Members that counsel for the Hoffer plaintiffs had taken the position that MDL 551 counsel were not entitled to settle with the State, and that the State's $10 million contribution to the Consolidated Settlement was inadequate. We thus find no error in the district court's determination that the Notice of Settlement was a clear and adequate disclosure of the nature of the Consolidated Settlement, including the Class' release of the claims asserted against the State in Hoffer in return for the $10 million contribution.
 
 
 144
 c. Contribution Justification
 
 
 145
 The Hoffer Group next challenges the district court's consideration of the claimed contribution justification--the possibility that the State would bring claims for contribution against the settling MDL 551 Defendants if Hoffer were allowed to continue--to support its conclusion that the State's contribution to the Consolidated Settlement was fair, adequate, and reasonable.[16] The Hoffer Group contends that under applicable Washington law, the State would be precluded from recovery of contribution.
 
 
 146
 We agree with the Hoffer Group that under applicable law, it would be unlikely that the State of Washington could recover contribution from the settling MDL 551 Defendants. The relevant statute, section 4.22.060(2) of the Washington Revised Code, states in pertinent part: "A release, covenant not to sue, covenant not to enforce judgment, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution. ..." Wash.Rev.Code Ann. § 4.22.060 (1988); see also Zamora v. Mobil Oil Co., 104 Wash.2d 211, 218, 704 P.2d 591, 596 (1985) (holding that in the absence of contractual arrangement between the defendants to the contrary, contribution and indemnity rights do not survive a settlement under section 4.22.060(2)). Nonetheless, we find no error in the district court's observation that "there is more value to Class Members in resolving the Hoffer claims than might appear viewing the settlement amount in isolation." In re Washington Public Power, 720 F.Supp. at 1416. The district court's primary concern if the State brought contribution claims against the settling MDL 551 Defendants was that the MDL 551 Class Members might be required to use monies from the Settlement Fund to make indemnification payments for amounts that could be assessed against those defendants. See 720 F.Supp. at 1416 ("Plaintiffs would essentially be required to fund themselves with settlement money."). This concern is largely identical to the district court's "[m]ore significant[ ]" finding that any total damage award for the torts alleged in Hoffer would be subject to reduction for damages found to be caused by the MDL 551 Defendants. Id. See Wash.Rev.Code Ann. § 4.22.060(2) (1988) ("the claim of the releasing person against other persons is reduced by the amount paid pursuant to the agreement unless the amount paid was unreasonable...." (emphasis added)). In the district court's words, "any aggregate recovery that might be attained for Plaintiffs' damages would be offset by the amount of the MDL settlement payments." 720 F.Supp. at 1416. Thus, although it is possible that the aggregate recovery attained by the Hoffer Group would be reduced more substantially through claims for contribution against the settling MDL 551 Defendants, under either theory, the aggregate recovery in Hoffer could be reduced at a minimum by the amount of the MDL 551 settlements. Because we find these concerns to be largely identical, we reject the Hoffer Group's contention that the consideration of the claimed contribution justification warrants reversal of the district court's approval of the Consolidated Settlement.
 
 
 147
 d. Merits of the Claims in Hoffer
 
 
 148
 Perhaps most significantly, the Hoffer Group attacks the district court's finding that the claims asserted against the State in Hoffer rely on untried hypotheses that would require the survival of uncertain claims and favorable legal decisions throughout. The Hoffer Group contends the district court ignored the scope and magnitude of the Washington Supreme Court's dual decision in Hoffer, in which the Court reinstated eight of nine alleged causes of action that had been dismissed by the Superior Court for failure to state a claim. See Hoffer v. State, 110 Wash.2d at 423-35, 755 P.2d at 786-92. The Hoffer Group asserts that in so ruling, the Washington Supreme Court validated its most far-reaching theories of liability against the State, thereby removing the principal legal obstacles which its members faced in the prosecution of Hoffer. The Hoffer Group thus disputes the district court's contrary conclusion that its claims against the State remained uncertain and hypothetical in nature.
 
 
 149
 Although the Washington Supreme Court reinstated eight of the Hoffer Group's nine alleged causes, it did so only in the context of a motion to dismiss for failure to state a claim.[17] The merits of the Hoffer Group's claims had not been subjected to motions for summary judgment, and extensive discovery had not been conducted. We therefore have no reason to question the district court's finding that the Hoffer Group's case against the State relies on a number of uncertain claims and faces many legal obstacles. In order to be successful on some or all of its claims against the State, the Hoffer Group would have to demonstrate at trial, among other things, that a letter from the Washington State Auditor which appeared in the annual reports submitted by WPPSS between 1976 and 1980 contained implicit assurances that the Auditor was familiar with WPPSS's finances and that he had uncovered no weaknesses in the investment; that the State Auditor intended for the letter to reach current and future bondholders, or at least knew that it was being so used; that the State Auditor knew that the letter contained fraudulent misrepresentations; that the bondholders relied on these alleged implicit and fraudulent misrepresentations; that the State Auditor acted as a seller under Wash.Rev.Code Ann. § 21.20.430(1) (1988); and that the State of Washington intentionally interfered with their contract with WPPSS by playing a role in WPPSS's decision to terminate Projects 4/5. In the absence of extensive discovery, it is by no means certain that the Hoffer Group would be able to make these necessary factual showings. Moreover, several legal obstacles, such as Washington's public duty doctrine,[18] stand in the way of the Hoffer Group's claims if certain of these necessary factual showings are not made. We find no error in the district court's consideration of the uncertainty of the Hoffer Group's claims as a factor in support of its conclusion that the State's contribution to the Consolidated Settlement was fair, adequate, and reasonable.
 
 
 150
 e. Unlimited Ability of the State to Pay
 
 
 151
 Finally, the Hoffer Group contends that the district court erred in approving the amount of the State's contribution because the State was the only remaining party that had the ability and capacity to satisfy a judgment that would make the class whole.[19] Noting that many of the settling MDL 551 Defendants either would not be able to withstand larger settlement or judgments or had threatened to declare bankruptcy if they were forced to do so, the Hoffer Group argues that the State is the only remaining defendant who has an unlimited ability to satisfy a judgment to the full extent of the class' damages while at the same time not being able to avail itself of the protection of the United States bankruptcy laws. In light of its claim that the recoverable rescissory damages in Hoffer could amount to $2.6 billion, the Hoffer Group asserts that the district court's determination that the State's unlimited ability to pay is "persuasive of nothing" constitutes plain error. In addition, the Hoffer Group contends that there is great leverage on the State to settle Hoffer for a far greater amount than its $10 million contribution, as is evidenced by the State's "jumping" at the first chance to settle the case.
 
 
 152
 Although the Hoffer Group is correct in its assertion that a settling defendant's ability to pay may be a proper factor to be considered in evaluating a proposed class action settlement, see Officers for Justice, 688 F.2d at 625, we reject the Hoffer Group's contention that the district court failed to consider this factor in separately evaluating the State's contribution to the Consolidated Settlement. The district court specifically noted that a defendant's ability to pay "has some bearing on the State's settlement contribution." In re Washington Public Power, 720 F.Supp. at 1416, a statement that is consistent with Officers for Justice's requirement that the evaluation of a class action settlement involve a balancing of several factors. See 688 F.2d at 625. We read the district court's statement that the Hoffer Group's contention is "persuasive of nothing," in context, as meaning only to rebut the Hoffer Group's implicit argument that because the State has an unlimited ability to pay, the State's contribution of $10 million a fortiori should be rejected. We thus have no quarrel with this statement. If the Hoffer Group's argument were to be accepted, the evaluation of any proposed settlement that involves a defendant with the capacity to make a class whole would be based primarily, if not exclusively, on this factor alone, an analysis which finds no support in the law and is inconsistent with tenets of Officers for Justice.
 
 
 153
 The State's decision to contribute to the Consolidated Settlement in no way validates the Hoffer Group's assertion that the State had every incentive to settle for a much greater amount. The district court specifically found that "[t]here is no reason to assume that the State would not aggressively attack, and plausibly defeat, efforts to maintain [Hoffer ]." 720 F.Supp. at 1416, a finding that is not disputed by the Hoffer Group. The district court noted that the State's decision to contribute to the Consolidated Settlement may well have been based on its desire for increased bond ratings, and its estimate that it might expend an equivalent amount defending Hoffer. We find no error in this determination. Accordingly, we conclude that the Hoffer Group has failed to demonstrate that the district court abused its discretion in determining that the State's contribution to the Consolidated Settlement was fair, adequate, and reasonable.
 
 CONCLUSION
 
 154
 For the foregoing reasons, we affirm the district court's September 5, 1989, order and judgment, as amended, approving of the settlement agreements in all respects. We also affirm the district court's September 16, 1990, order approving of the Allocation Plan in all respects.
 
 
 
 *
 The panel unanimously finds appeals nos. 90-15451 and 90-16446 suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 [1]
 WPPSS was organized in 1957 by eighteen Washington municipal corporations to serve as a construction and financing vehicle for power-generating projects beyond the capacity of any single utility
 
 
 [2]
 In the interests of avoiding confusion, we make the following distinctions between these groups. "MDL 551 Class Members" are all those individuals who purchased their Projects 4/5 Bonds from March 1, 1977 through June 15, 1983, whether or not they still hold the bonds. "Bondholders" are all those individuals who currently hold Projects 4/5 bonds. Hence, not all Bondholders are MDL 551 Class Members, as several Bondholders purchased their bonds after the class boundary date of June 15, 1983. Similarly, not all MDL 551 Class Members are Bondholders, as several have sold their bonds
 
 
 [3]
 The district court dismissed BPA as a defendant on October 21, 1987, holding that the discretionary function exception to the Federal Tort Claims Act barred all of the claims asserted against BPA. The district court also dismissed as to certain individual defendants
 
 
 [4]
 The Heerey Group includes some individuals and entities that purchased Projects 4/5 bonds before June 15, 1983, and thus to that extent are MDL 551 Class Members. The Heerey Group alleges, however, that all its members purchased the majority of their bonds after the class boundary date
 
 
 [5]
 WPPSS, the City of Tacoma, Public Utility District No. 1 of Clark County, Public Utility District No. 1 of Cowlitz County, Public Utility District No. 1 of Snohomish County, and Wood Dawson Smith & Hellman
 
 
 [6]
 The parties to the New York state court action have agreed to a stay of the case in light of and pending resolution of the proposed MDL 551 settlement agreements
 
 
 [7]
 The Heerey Group insists that these factual inquiries cannot be resolved without the participation of those persons against whom the issue is to be resolved in the court as a full-fledged party. Along this same line, the Heerey Group also argues that the common law exception to the general rule of prior adjudication is only applicable when considering the preclusive effect of a judgment in a subsequent proceedings. The Heerey Group contends that if the district court is allowed to resolve the questions of Chemical Bank's authorization to compromise its claims and whether the Bank adequately represented its members' interests, it will necessarily determine the preclusive effect of its own judgment, thereby prohibiting the Heerey Group from attacking the judgment in a subsequent proceeding as expressly provided in the Restatement. See Restatement (Second) of Judgments § 41, comment (a) ("the represented person may avoid being bound ... by attacking the judgment by subsequent proceedings.")
 We disagree. The Restatement (Second) of Judgments provides that in cases in which the represented person challenges the authority or adequacy of its representative, "the represented person may avoid being bound by appearing in the action before rendition of the judgment or by attacking the judgment by subsequent proceedings." Id. § 41, comment (a) (emphasis added). The Restatement thus affords a represented person alternate avenues to challenge the authority or adequacy of its representative.
 The Heerey Group appeared before the district court at the Settlement Hearing (pursuant to the court's stated intention to hear from all interested persons) and contested Chemical Bank's authority as well as the adequacy of Chemical Bank's representation. If the Heerey Group had been successful, the district court presumably would have held that Chemical Bank had not acted in privity with the Group's members. The Heerey Group alternatively could have chosen to avoid MDL 551 altogether and instead attack the preclusive effect of the anti-suit injunctions in New York state court, where it would have been a party. Having chosen to appear before the district court and contest Chemical Bank's authority and the adequacy of its representation, the Heerey Group cannot now be heard to complain that because the district court ruled against them, the court unlawfully prohibited its members from attacking the district court's judgment in a subsequent proceeding.
 
 
 [8]
 The district court reached the same conclusion in rejecting a similar challenge made by the MDL 551 defendants. In re Washington Public Power Supply Sys. Sec. Litig., 623 F.Supp. 1466, 1483 (W.D.Wash.1985), aff'd, 823 F.2d 1349 (9th Cir.1987)
 
 
 [9]
 We cannot agree with the Heerey Group's assertion that section 11-1.1(b)(13) does not vest in Chemical Bank authority to compromise its members claims because the term "fiduciary" is defined by the statute to mean "trustee" rather than "beneficiary." N.Y.Est. Powers & Trusts Law § 11-1.1(a)(3). This distinction is meaningless. Section 11-1.1(b)(13) expressly empowers Chemical Bank to compromise claims in favor of the trust. Chemical Bank therefore is empowered to compromise the claims of the Bondholders
 The Heerey Group also asserts, citing Meckel v. Continental Resources Co., 758 F.2d 811, 816 (2d Cir.1985), that it is a "highly debatable proposition" that section 11-1.1(b)(13) applies to indenture trustees. The Heerey Group evidently is relying on a passage in Meckel in which the Second Circuit stated that "[u]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." Id. at 816. This language simply has no relevance here. Our consideration of section 11-1.1(b)(13) is not based upon an analysis of common-law duties imposed beyond those in the trust agreement, rather, it is compelled by the Bond Resolution itself.
 
 
 [10]
 Chemical Bank's principal attorneys in this litigation were from the law firm of Cravath, Swaine & Moore
 
 
 [11]
 Additionally, the Heerey Group contends the injunctions entered by the district court pursuant to the settlement agreements are broader than the agreement. The settlement agreements as set forth in both the final agreements and preliminary memoranda restrict all Bondholders, regardless of whether or not they are also MDL 551 Class Members, from bringing similar suits. While the final settlement agreements are more detailed than the preliminary memoranda, we hold that the agreements encompass the injunction
 
 
 [12]
 Lehmann was elected as a member of the WPPSS Projects 4/5 Bondholders Committee in 1983
 
 
 [13]
 Because each of the three prongs of the Hunt test must be satisfied in order to confer associational standing, we need not consider whether Bond investors meets the first or third prongs of this threshold test
 
 
 [14]
 The Eleventh Amendment provides:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 U.S. Const. amend. XI. Although the Eleventh Amendment does not expressly prohibit suits in federal court against a state by its own citizens, it has long been interpreted to bar such suits. See Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
 
 
 [15]
 It is worth noting that several courts have held that in evaluating the fairness of a proposed settlement under Rule 23, a court should determine only if the total compensation to the class is fair, adequate, and reasonable, and need not speculate as to the appropriate contribution of each defendant. See, e.g., In re Warner Communications Sec. Litig., 798 F.2d 35, 37 (2d Cir.1986); Masterson v. Pergament, 203 F.2d 315, 330 (6th Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953); Duban v. Diversified Mortgage Investors, 87 F.R.D. 33, 40 (S.D.N.Y.1980). Because we find the district court here separately considered the fairness, adequacy, and reasonableness of the State's contribution to the Consolidated Settlement, we need not pass on the question of whether the court was required to do so
 
 
 [16]
 Because the MDL 551 Class Members had indemnified the settling MDL Defendants from contribution claims, they would be required to defend the MDL 551 Defendants if any such claims were brought.17 Under Washington law, courts should dismiss a claim under Washington Rule CR 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief." Corrigal v. Ball & Dodd Funeral Home, 89 Wash.2d 959, 961, 577 P.2d 580, 582 (1978). As such, "any hypothetical situation conceivably raised by the complaint defeats a 12(b)(6) motion if it is legally sufficient to support plaintiff's claim." Halvorson v. Dahl, 89 Wash.2d 673, 674, 574 P.2d 1190, 1191 (1978)
 
 
 [18]
 Under Washington's public duty doctrine, the State cannot be held liable for tortious acts of its officials if that liability is based on a duty owed to the public generally. See, e.g., Hoffer, 110 Wash.2d at 411-412, 755 P.2d at 785
 
 
 [19]
 The only other defendant who would be able to withstand a judgment that would make the class whole, BPA, was dismissed as a defendant in MDL 551 by the district court on October 21, 1987