**SAN FRANCISCO NAACP,
et al., Plaintiffs,**

v.

**SAN FRANCISCO UNIFIED SCHOOL
DISTRICT, et al., Defendants.**

**Brian Ho, by his parent and
next friend, Carl Ho, et
al., Plaintiffs,**

v.

**San Francisco Unified School District,
et al., Defendants.**

**Nos. C–78–1445 WHO, C–94–2418 WHO.**

United States District Court,
N.D. California.

July 2, 1999.

Thomas I. Atkins, Brooklyn, NY, Peter Cohn, Petaluma, CA, Eva Paterson, Michael Harris, Lawyers' Committee for Urban Affairs, San Francisco, CA, James L. Hunt, Hayward Gilliam, McCutcheon,

Doyle, Brown & Enersen, San Francisco, CA, for plaintiffs.

Aubrey V. McCutcheon, Jr., Aubrey V. McCutcheon, Jr. Law Offices, Ypsilanti, MI, for the San Francisco Unified School District and San Francisco Board of Education.

Patrick J. Manshardt, Individual Rights Foundation, Los Angeles, CA, for defendant California Department of Education, Joseph Remcho, Robin Johansen, Remcho Johansen & Purcell, San Francisco, CA.

Daniel C. Girard, Robert Crowe, Anthony K. Lee, Gordon M. Fauth, Girard & Greene, LLP, San Francisco, CA, David S. Levine, San Francisco, CA, for plaintiffs.

Aubrey V. McCutcheon, Jr., Ypsilanti, MI, for the San Francisco Unified School District and Waldemar J. Rojas, Superintendent of the San Francisco Unified School District.

Patrick J. Manshardt, Individual Rights Foundation, Los Angeles, CA, for the Board of Education of the State of California.

Joseph Remcho, Robin Johansen, Remcho, Johansen & Purcell, San Francisco, CA, for the California Department of Education and Delain Eastin, Superintendent of Public Instruction of the State of California.

Thomas I. Atkins, Brooklyn, NY, Peter Cohn, Petaluma, CA, Eva Paterson, Michael Harris, Lawyers' Committee for Urban Affairs, San Francisco, CA, James L. Hunt, Hayward Gilliam, McCutcheon, Doyle, Brown & Enersen, San Francisco, CA, for San Francisco National Association for the Advancement of Colored People.

## OPINION AND ORDER

ORRICK, District Judge.

All of us do not have equal talent, but all of us should have an equal opportunity to develop our talents.

This oft-stated creed of President John F. Kennedy is at the core of the dispute between the parties in these two related desegregation lawsuits, *San Francisco NAACP v. San Francisco Unified School District*, No. C–78–1445 WHO ("the NAACP action"), and *Ho v. San Francisco Unified School District*, No. C–94–2418 WHO ("the Ho action"). In an effort to provide equal opportunity for San Francisco's 65,000 schoolchildren of exceptionally diverse origins, the parties in these two related desegregation cases, have strenuously endeavored to achieve President Kennedy's goal, albeit from often sharply differing viewpoints. After years of highly contentious litigation, encompassing drastic demographic changes in the San Francisco Unified School District, the parties have agreed to put their differences aside, and have submitted a stipulated settlement for the Court's approval. For the reasons set forth below, the Court finds that the proposed settlement is a fair, reasonable and adequate resolution of the litigation.

### I.

In 1978, the San Francisco National Association for the Advancement of Colored People ("NAACP") filed the *NAACP* action, seeking desegregation of the San Francisco Unified School District ("SFUSD") on behalf of a class of all children of school age who are or may in the future become eligible to attend the public schools of the SFUSD. The suit was brought against the SFUSD, its Board Members, and its Superintendent (collectively the "Local Defendants"), and the California State Board of Education, the State Superintendent of Public Instruction, and the State Department of Education (collectively the "State Defendants").

In 1983, the Court approved a Consent Decree to resolve the *NAACP* action. *See San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 576 F.Supp. 34 (N.D.Cal.1983). Paragraph 13 of the Consent Decree, as amended, sets forth racial and ethnic guidelines for the assignment of

San Francisco schoolchildren to the schools of the SFUSD. Pursuant to paragraph 13, no school may have fewer than four racial/ethnic groups represented in its student body, and no racial/ethnic group may constitute more than forty-five percent of the student enrollment at any regular school, or more than forty percent at any alternative school. Paragraph 12 of the Consent Decree identifies nine racial/ethnic groups for the purpose of defining the racial/ethnic composition of each school: Spanish-surname, Other White, African–American, Chinese, Japanese, Korean, Filipino, American Indian, and Other Non–White.

In 1994, several schoolchildren of Chinese descent filed the *Ho* action against the State and Local Defendants, alleging that paragraph 13's student assignment plan constitutes race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In January 1995, the *Ho* plaintiffs filed a first amended complaint adding the NAACP as a defendant. In March 1996, the Court certified the *Ho* action as a class action on behalf of all children of Chinese descent of school age who are current residents of San Francisco and who are eligible to attend the public school system.

In May 1997, the Court denied the *Ho* plaintiffs' motion for summary judgment. The *Ho* plaintiffs appealed the Court's summary judgment ruling, and also sought a writ of *mandamus* directing the Court not to proceed with the trial. In an Opinion filed June 4, 1998, the Ninth Circuit dismissed the appeal for lack of jurisdiction and denied the petition for a writ of *mandamus*, but provided substantial guidance to the parties and the Court on the issues remaining for trial, and on the law governing those issues. *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 861 (9th Cir.1998).

The Ninth Circuit affirmed this Court's finding that the assignment of students by race subjects the students to a race-based classification by a state actor. *Id.* at 862. Such racial classifications are subject to strict scrutiny, and may be used by the government only if necessary to correct the effects of government action of a racist character. *Id.* at 864 (quoting *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), and citing *Freeman v. Pitts,* 503 U.S. 467, 494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992)). The Ninth Circuit found that the burden of justifying the racial classification fell upon the defendants. *Id.* at 865. It described the issues remaining for trial as follows:

> As race may permissibly be used by government in the very limited way described, two issues remain for trial: Do vestiges remain of the racism that justified paragraph 13 of the consent decree in 1983? Is paragraph 13 necessary to remove the vestiges if they do remain?

*Id.* at 865.

The Ninth Circuit found defendants' evidence to be conclusory. *Id.* It specifically noted that defendants could not prevail at trial unless they produced more concrete evidence than they submitted in opposition to the *Ho* plaintiffs' motion for summary judgment. *Id.* The Ninth Circuit stressed that defendants' evidence must tie the current vestiges of segregation to the discriminating practices and policies that justified the adoption of the Consent Decree in 1983. *Id.* It also held that it was defendants' burden "to demonstrate that paragraph 13 is still a remedy fitted to a wrong—to show that the racial classifications and quotas employed by paragraph 13 are tailored to the problems caused by vestiges of the earlier segregation." *Id.* The Ninth Circuit concluded that "[f]rom this discussion it emerges that the district court is not in error in scheduling a trial that will promptly address the plaintiffs' case." *Id.*

Trial was scheduled to begin on September 22, 1998. At an informal status conference on August 28, 1998, it immediately

became apparent that defendants were utterly unprepared to go to trial. Counsel for the SFUSD informed the Court that the parties were close to settlement. The Court berated the parties for neglecting their trial preparation, but vacated the trial date and referred the case to a special master for settlement discussions. When settlement discussions proved unsuccessful, the Court set a new trial date of February 16, 1999.

Shortly thereafter, plaintiffs filed a motion for preliminary injunction, seeking to enjoin defendants from further implementation of paragraph 13. On December 10, 1998, the Court denied the motion for a preliminary injunction, finding that, although defendants had shown little likelihood of prevailing at trial, plaintiffs had not shown irreparable harm sufficient to justify immediate injunctive relief. The Court found that the trial was likely to conclude in time for the Court to order the SFUSD to assign students to schools for the 1999–2000 school year in a race-neutral manner, if plaintiffs prevailed at trial. Accordingly, the Court ordered the SFUSD to file, by February 1, 1999, a proposed student assignment plan that was not race based, and that could be implemented in time for the 1999–2000 school year if defendants did not prevail at trial.

On February 16, 1999, the day trial was to begin, the parties requested that the start of trial be delayed so that they could finalize a settlement. After meeting *in camera* with counsel, the Court determined that settlement appeared to be imminent, and postponed the start of trial for several hours. Shortly thereafter, the parties reached a settlement and submitted it to the Court. At a hearing the following morning, the Court tentatively approved the settlement and set a fairness hearing for April 20, 1999.

## II.

The terms of the settlement are as follows:

A. The Consent Decree entered in [the *NAACP* action] shall be modified to provide (a) that it will terminate no later than December 31, 2002, subject to Court approval; and (b) that any party may move for unitary status prior to that date. The parties anticipate that no later than such time, the state and local governmental defendants will have taken all reasonably practical measures to remedy any vestiges of segregation.

B. Pursuant to paragraph 50 of the Consent Decree, the SFUSD and the State Superintendent of Public Instruction shall develop a new student assignment plan consistent with the criteria contained in this agreement. The SFUSD and the State Superintendent shall submit the proposed modifications to the San Francisco NAACP and the *Ho* plaintiffs for review and comment.

C. The parties acknowledge that SFUSD officials have the duty and authority to determine lawful criteria for admission to all schools in the SFUSD. The parties further acknowledge that in setting those criteria, state and federal law provide that district officials may consider many factors, including the desire to promote residential, geographic, economic, racial and ethnic diversity in all SFUSD schools. However, race or ethnicity may not be the primary or predominant consideration in determining such admission criteria. Further, the SFUSD will not assign or admit any student to a particular school, class or program on the basis of the race or ethnicity of that student, except as related to the language needs of the student or otherwise to assure compliance with controlling federal or state law.

D. Paragraph 12 of the Consent Decree shall be modified to provide that the SFUSD may request, but not require, that parents and/or students identify themselves by race or ethnicity at the time of actual enrollment. Any request for racial or ethnic data will be optional, except as required by state or

# 1026

federal statute or regulation, and shall contain a "decline to state" provision. Any such request will clearly provide that racial or ethnic self-identification is optional and that no adverse consequences will result in failing to do so.

E. The proposed modifications for student assignments beginning with the 2000–01 school year shall be submitted to the Court for approval. If approved, the proposed modifications will replace paragraphs 13(a), (b), (c), (d), and (h) of the Consent Decree. In the event the parties cannot agree on the terms of the proposed modifications by October 1, 1999, any party may then seek Court approval of its own plan through a motion to modify the Consent Decree under Paragraph 50 thereof and to modify or dissolve the preliminary injunction (*see* Paragraph H of this agreement) under Federal Rule of Civil Procedure 60(b)(5).

F. Once approved, the SFUSD will publicize the modifications, including those made under this agreement, throughout the SFUSD. Principals, Education Placement Center personnel and others involved in the assignment of pupils in the SFUSD shall be trained for effective administration of the new procedures, and workshops will be convened in parent centers to explain them.

G. The parties acknowledge that notwithstanding Paragraph C above, it is possible that there may be identifiable racial or ethnic concentration at a particular school or schools that will adversely affect the SFUSD's educational goals or programs in that school or schools. By

October 15, 2000, and by October 15, 2001, the SFUSD shall make available to the parties information concerning the racial composition of each school within the SFUSD. If any party notifies the District that it believes that there may be identifiable racial or ethnic concentration at a particular school or schools, or at the Court's direction, the parties shall meet promptly to discuss the matter. If the parties agree that further modification of Paragraph 13 of the Consent Decree is warranted, the proposed modifications shall be submitted to the Court for approval. If the parties are unable to agree, the District shall confer with the State Monitor to develop appropriate proposed modifications. The SFUSD shall notify the parties of the proposed modifications, and the parties shall then have 15 days to notify the SFUSD of whether they agree to those proposed modifications. If the parties cannot agree on the terms of these proposed modifications, any party may then seek Court approval of its own proposals through a motion to modify the Consent Decree under Paragraph 50 thereof. Notwithstanding the time period set for termination of the Consent Decree under Paragraph A of this agreement, the provisions of this paragraph will terminate on December 31, 2001, subject to Court approval.

H. To implement this agreement, the parties will stipulate to the entry of a preliminary injunction consistent with Option 1 of Attachment A to the Report filed by the SFUSD with the Court on February 1, 1999.[1] Unless it is modified

---

1. Option 1 of Attachment A to the Report filed by the SFUSD with the Court on February 1, 1999, provides:

Anything that is not mentioned as a modification will continue as in the past.

a. Remove racial/ethnic guidelines (40% at alternative schools; 45% at regular schools).

b. Remove Priority 5 in the computer random selection run—African American, Hispanic/Latino and other students.

*Procedures (consistent with current operating processes)*

---

1. All parents new to SFUSD who are applying to attend San Francisco public schools K–12 would fill out the Registration/OER application forms whether applying for schools based on home address or for school choices.

2. Parents of current SFUSD students wishing to change schools for the next school year may fill out the Registration/OER application forms described above during a defined application period.

3. Parents of current SFUSD students graduating from 5th grade and 8th grade

or dissolved, the preliminary injunction shall govern assignment of students in the SFUSD beginning with the 1999–2000 school year. The preliminary injunction shall provide that the SFUSD will not assign or admit any student to a particular school, class or program on the basis of the race or ethnicity of that student, except as related to the language needs of the student or otherwise to assure compliance with controlling federal or state law. The preliminary injunction shall take effect only upon Court approval.

I. Neither the San Francisco NAACP nor the *Ho* plaintiffs will allege violations of the Fourteenth Amendment arising from any racial isolation or racial identifiability of any school, class or program, which may result from the implementation of the preliminary injunction.

J. The parties shall cooperate to present to the Court proposed modifications under Paragraph 50 of the Consent Decree and otherwise to implement this agreement. The parties further agree that, as part of their status as intervenors in [the *NAACP* case], the *Ho* plaintiffs will be permitted, subject to Court approval, to participate in the implementation of the modifications to the Consent Decree that result from this agreement to ensure that their terms are executed.

K. The Court and the parties will receive periodic reports about the implementation of the Consent Decree, including any official reports sent to the State Department of Education and to the San Francisco NAACP in [the *NAACP* action].

### III.

#### A.

■ "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R.Civ.P. 23(e). The purpose of Rule 23(e) is to protect " 'unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of the individual claims by a compromise.' " *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane , Federal Practice and Procedure § 1797 at 340–41). Accordingly, the standard by which a proposed settlement is to be evaluated is " 'whether the settlement is fundamentally, fair, adequate and reasonable.' " *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir.1992) (quoting *Officers For Justice v. Civil Serv. Comm'n of the City & County Of San Francisco,* 688 F.2d 615, 625 (9th Cir.1982)).

#### B.

The Ninth Circuit has summarized the Court's procedural obligations as follows:

[T]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice; the notice must indicate that a dissident can object to the settlement and to the definition of the class; each objection must be made a part of the record; those members raising substantial objections must be afforded an opportunity to be heard with the assistance of privately retained counsel if so desired, and a reasoned response by the court on the record; and objections

may fill out the Registration/OER application if they wish to choose next year's schools other than the school assignments based on home addresses.

4. The random selection run would be programmed for spaces by grade and program at each school. The program would include all priorities except priority 5. The computer random selection will be programmed to eliminate racial/ethnic guidelines.

without substance and which are frivolous require only a statement on the record of the reasons for so considering the objection.

*Officers for Justice,* 688 F.2d at 624 (citing *Mandujano v. Basic Vegetable Prods., Inc.,* 541 F.2d 832, 835–36 (9th Cir.1976)).

The Court and the parties have satisfied these procedural requirements. On February 26, 1999, the Court ordered the parties to provide notice of the proposed settlement, and of the April 20, 1999 fairness hearing, to the class members of the *Ho* and *NAACP* actions. The Court ordered the SFUSD to publish a notice three times weekly for two consecutive weeks in the following papers: (a) the *San Francisco Chronicle,* the *San Francisco Examiner,* the *Sun Reporter,* the *Bayview,* and the *San Francisco Independent,* in English; (b) *Sing Tao,* translated into Chinese; and (c) *El Mensajero,* translated into Spanish. The Court also ordered the SFUSD to cause copies of the notice to be posted (in English, Chinese, and Spanish) at the main office of the SFUSD, at the main office of each school operated by the SFUSD, and at the parent centers operated by the SFUSD. The Court found that this form of notice was reasonably calculated to reach the class members in both actions, was the best notice practicable under the circumstances, and satisfied the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure.

At the fairness hearing, several persons complained that notice of the hearing was not posted at Balboa and Lowell High Schools, contrary to the Court's order. The Court has since received sworn declarations attesting that the notice was posted at the main office of Balboa High School, but was *not* posted at Lowell, due to a misunderstanding by Lowell's Principal, Paul Cheng. The Court regrets this misunderstanding, but nonetheless finds that Lowell students had adequate notice of the fairness hearing in light of the publication of the notice in numerous local newspapers, and because stories about the settlement were published in the Lowell student newspaper on March 11 and 12, more than a month before the fairness hearing.

The notice also expressly provided for the filing of comments about the proposed settlement, and set forth a procedure by which interested parties could make comments at the fairness hearing. The Court has received comments, written and oral, and requests to appear at the fairness hearing, all of which have been made part of the record.

### C.

In determining whether the settlement is fair, reasonable, and adequate, the Court is required to balance some or all of the following factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998) (citing *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.1993) (quoting *Officers For Justice,* 688 F.2d at 625)). The Ninth Circuit has stressed that this is not an exhaustive list of relevant considerations, nor even necessarily the most significant factors. *Officers For Justice,* 688 F.2d at 625. Moreover, "[t]he relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Id.*

The issue is not whether the settlement could be better, but whether it is fair, reasonable, and adequate and free

from collusion. *Hanlon*, 150 F.3d at 1027. There is a strong judicial policy in favor of settlements in complex class actions. *Class Plaintiffs*, 955 F.2d at 1276.

■ The Court may not delete, modify or substitute certain provisions. *Hanlon*, 150 F.3d at 1026 (quoting *Officers For Justice*, 688 F.2d 615 at 628). The settlement must stand or fall in its entirety. *Id.*

1.

The first factor is the strength of plaintiffs' case. *Hanlon*, 150 F.3d at 1026. Based on the evidence submitted to the Court before trial, plaintiffs were likely to succeed on their claim that the race-based student assignment plan is no longer constitutional.

■ The Supreme Court has placed severe restrictions on the use of racial classifications by governmental entities. Such classifications are subject to the strictest judicial scrutiny, and are constitutional only if they are narrowly tailored measures that further compelling governmental interests. *Adarand*, 515 U.S. at 227, 115 S.Ct. 2097. In the *Ho* action, the Ninth Circuit held that "[r]acial balancing cannot be the objective of a federal court unless the balancing is shown to be necessary to correct the effects of government action of a racist character." *Ho*, 147 F.3d at 865 (citing *Freeman*, 503 U.S. at 494, 112 S.Ct. 1430). The Ninth Circuit found that the SFUSD had the burden of proving that vestiges still exist of the discriminatory policies and practices that justified the Consent Decree in 1983, and that the race-based student assignment plan in the Consent Decree is necessary to address the problems caused by the vestiges of the earlier segregation. *Id.*

It is apparent to the Court that defendants in the *Ho* action were having great difficulty trying to prove that any current problems in the SFUSD were caused by governmental discrimination prior to 1983. The Ninth Circuit described the evidence submitted by the SFUSD in opposition to summary judgment as "conclusory," and warned that the SFUSD would have to produce more concrete evidence at trial. *Ho*, 147 F.3d at 865.

Several months later, the *Ho* plaintiffs moved for a preliminary injunction. Despite having had several months to gather the evidence required by the Ninth Circuit's Opinion, defendants' evidence was still conclusory. This Court found that:

Nowhere in defendants' briefing do they make any attempt to identify the discriminating policies and practices that justified the Decree in 1983. Without doing so, they cannot meet their burden of demonstrating that any current problems in the SFUSD are vestiges of those earlier discriminating policies and practices....

In addition, the evidence submitted by defendants of the alleged vestiges of past racial discrimination is conclusory and anecdotal....

Based on the evidence submitted in opposition to plaintiffs' motion for preliminary injunction, then, defendants have shown almost no likelihood of prevailing at trial.

(Memorandum Decision & Order, filed Dec. 10, 1998, at 11–12.) [2]

---

2. One of the key legal disputes in this action was over the burden of proof, with each party arguing that the opposing party bore the burden of proof. Although the Ninth Circuit resolved this issue, defendants continued to argue that plaintiffs bore the burden of proof, and that the Ninth Circuit's Opinion was inconsistent with Supreme Court case law. While the Court was considering the motion for preliminary injunction, it became concerned that, because of this dispute over the burden of proof, neither plaintiffs nor defendants were developing an adequate factual record to ensure that the trial in this action would .be based on facts, rather than on an absence of facts. The Court then notified the parties that it would request the special master to prepare a summary of the evidence that had been submitted to the Court in the *NAACP* action prior to 1983. The Court also notified the parties that it would be appointing its own expert witnesses, as it is entitled

By Orders filed January 28, 1999 and February 11, 1999, the Court also struck a number of defendants' expert reports as too conclusory to comply with the relevant Federal Rules of Civil Procedure. The remaining expert reports contained minimal testimony attempting to link current problems in the SFUSD to acts of racial discrimination by the government prior to 1983.

At the time of trial, the State Board of Education had realigned itself with plaintiffs in challenging the constitutionality of the race-based assignment plan contained in paragraph 13, and seeking dissolution of the entire Consent Decree. The State Superintendent agreed with plaintiffs that the race-based assignment plan was no longer legally justifiable, but planned to present proposed modifications to the assignment plan that would keep the remainder of the Consent Decree intact. Only the NAACP and the SFUSD still supported paragraph 13 in its original form.

■ It is thus clear to the Court that defendants had very little chance of prevailing at trial. There was little likelihood that defendants would be able to prove that the race-based student assignment plan was still constitutional today in light of the very strict burdens of proof imposed by the Supreme Court and the Ninth Circuit. Accordingly, this factor favors a settlement.

### 2.

The second factor to be considered is the risk, expense, complexity, and likely duration of further litigation. *Hanlon*, 150 F.3d at 1026. There is no question that

the trial would have been lengthy and complex. The parties had identified a total of seventy prospective witnesses and more than 3,000 exhibits.

Even after the trial had been completed, there was a strong likelihood of further litigation on appeal, probably all the way to the Supreme Court, and the possibility of another trial after resolution of those appeals. The parties' fundamental dispute of law over the burden of proof guaranteed that regardless of the outcome of the trial, the case would continue to be litigated for years to come on appeal. Counsel for the SFUSD repeatedly assured this Court that it intended to take this case to the Supreme Court.

The years of litigation that were certain to result from a trial in the *Ho* action, regardless of the outcome, would have been very expensive. A great deal of that expense would have been borne by the taxpayers. In addition, the trial and subsequent litigation likely would have been extremely divisive in the community. The case had attracted considerable attention from the press in the weeks before trial. On the day trial was to begin, the courtroom was filled with press and concerned citizens. The Court has no doubt that a settlement of this action, if possible, would have been preferable to a lengthy, racially divisive trial. This factor also favors a settlement.

### 3.

The third factor is the risk of maintaining class action status throughout the trial. *Hanlon*, 150 F.3d at 1026. The *Ho* plaintiffs had already filed a motion to redefine

to do under Rule 706 of the Federal Rules of Evidence. Plaintiffs immediately filed a petition for a writ of *mandamus* to the Ninth Circuit, accusing the Court of interfering with the adversary system. On December 14, 1998, the Ninth Circuit granted a writ of *mandamus* and found that the Court, by appointing a special master to review the evidence already existing in the Court files, had improperly assumed a burden that belonged to defendants. Oddly, the Ninth Circuit permitted the special master to give his report to

the parties, but barred the Court from considering it unless it was filed by one of the parties. The result of this peculiar order was to prevent the Court from commissioning its own expert witness reports on whether or not vestiges of discrimination remained to be remedied in the SFUSD. From that point forward, the burden of gathering evidence rested entirely on defendants, who were ill prepared to present such evidence at trial because of their ongoing dispute over the burden of proof.

the class in the *NAACP* action, in which they asked the Court to create a subclass of the Chinese students who comprise the *Ho* class. Given the conflicting remedies sought by the two classes, the motion raised serious questions about the proper definition of the class in the *NAACP* action. Issues also were starting to arise about the propriety of the *Ho* class itself in light of the different needs of limited English proficiency Chinese students when compared to those Chinese students who are proficient in English.

If the Court had been required to redefine the classes in the *Ho* and *NAACP* actions, new counsel would have been brought in to represent the subclasses, which would have lengthened the proceedings and added significant extra expense. This factor also favors a settlement of the action.

### 4.

The fourth factor is the amount offered in settlement. *Hanlon*, 150 F.3d at 1026. Because there is no monetary settlement in this action, this factor has no relevance in this case.

### 5.

The fifth factor is the extent of discovery completed and the stage of the proceedings. *Hanlon*, 150 F.3d at 1026. Because this action settled on the day of trial, discovery was complete. Each side was well aware of the strengths and weaknesses of the other side's case. The settlement thus was based on the most complete information available. This factor also favors a settlement.

### 6.

The sixth and seventh factors are the experience and views of counsel, and the presence of governmental participants. *Hanlon*, 150 F.3d at 1026. All counsel have a great deal of experience in class action litigation and/or school desegregation.

Counsel for the *Ho* plaintiffs have represented plaintiffs in numerous class actions in federal court. Professor David Levine is on the faculty of Hastings College of the Law and has written extensively on the subjects of remedies, civil procedure, torts and institutional reform litigation.

The SFUSD and the NAACP were represented by the same counsel who appeared in the *NAACP* action in 1983 and who have worked on this litigation for the past sixteen years. As the Court stated in 1983,

> San Francisco NAACP is a charter member of the oldest existing civil rights organization in the country, an organization that is largely, if not wholly, responsible for the cause of action on which this very suit is founded. Mr. Thomas I. Atkins, plaintiffs' lead counsel, and other members of his team, have participated in suits to desegregate the schools of twenty-nine cities located in ten states, including the State of California. Lead counsel for the District, Mr. Aubrey V. McCutcheon, Jr., has been involved in the efforts to desegregate schools in ten cities. These counsel bring to their decision to settle this suit via the proposed Decree considerable knowledge of the strengths and pitfalls of school desegregation litigation and of the relief typically awarded in such cases.

*San Francisco NAACP*, 576 F.Supp. at 47 (footnotes omitted).

The State and Local Defendants are all governmental participants. The State Superintendent of Education is represented by Robin B. Johansen of the law firm of Remcho, Johansen, & Purcell, counsel experienced in the area of education and constitutional law. The State Board of Education is represented by the Individual Rights Foundation, a public interest law project that works to protect constitutional rights from governmental infringement. The State Superintendent and the State Board of Education took very different positions in this litigation and the fact that they, as well as the other experienced counsel in this litigation, all agreed on the

terms of the settlement strongly favors a settlement in this action.[3]

### 7.

The preceding factors all strongly favor a settlement of this action. The last remaining factor in determining whether the terms of this particular settlement are fair, reasonable, and adequate focuses on the reactions of the class members to the proposed settlement.

The Court has received one written comment in support of the proposed settlement, and twenty written comments opposing the settlement, including objections to the settlement filed by Dr. Gary Orfield, the chair of the Court's own Consent Decree Advisory Committee. A number of the letters opposing the settlement contain multiple signatures, or are attached to petitions, and thus appear to represent the views of more than one person or group.

The one letter in support of the settlement is from the Asian American Legal Foundation, which praised the settlement agreement as "honor[ing] the right of all children to attend public schools free from discrimination," and "refocus[ing] San Francisco public schools on improving the quality of education and expanding the participation of parents and the greater San Francisco community in public schools." (Comments of Asian American Legal Foundation.) It is not surprising that only one letter was submitted in support of the settlement, as the notice of settlement expressly provided that "If you are satisfied with the settlement described below, you need not take any action[.]" (Crowe Decl.Ex. W.) Thus, the Court does not consider the fact that only one letter was filed in support of the settlement as an indication of wide-spread dissatisfaction with the settlement.

Similarly, given the more than 65,000 class members in the *NAACP* and *Ho* actions, the twenty letters the Court received opposing the settlement do not ap-

pear to be an inordinately large number representing a groundswell of opposition.

Because many of the comments in opposition to the settlement address similar issues, the Court will address those comments issue by issue, rather than by individually addressing each letter received by the Court.

### 8.

First, however, the Court must consider the *Ho* plaintiffs' motion to strike certain of the objections for lack of standing and failure to comply with the requirements set forth in the notice of the fairness hearing. The notice provides that any person wishing to speak at the fairness hearing must file written comments with the Court no later than April 5, 1999. (Crowe Decl. Ex. W.) The notice provides that the written statement must:

(a) include your name and address;

(b) state whether you are a person presently enrolled in or eligible to enroll in the San Francisco public school system, or the parent or legal guardian of such a person;

(c) identify any other person or group you are authorized to represent; and

(d) describe your position regarding the settlement.

*Id.*

■ As the *Ho* plaintiffs note, nonclass members have no standing to object to the settlement of a class action. *See, e.g., Gould v. Alleco, Inc.,* 883 F.2d 281, 284 (4th Cir.1989) (citations omitted) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."). The only class members in the *Ho* and *NAACP* actions are children eligible to attend the schools of the SFUSD. The *Ho* plaintiffs move to strike all objections to the proposed settlement that were filed by anyone who is not a child eligible to attend the

---

**3.** The Court takes judicial notice that the State Board of Education approved the pro-

posed settlement on March 10, 1999. (Johansen Decl.Ex. B at 4.)

schools of the SFUSD, or the child's parent, legal guardian, or legal representative.

■ The Court agrees with the *Ho* plaintiffs that the following persons lack standing to file objections to the proposed settlement: Tania Kappner, Ronald T. Cruz, Mark Airgood, Yvette Felarca, Joyce Schon; and Heather Bergman and Shanta Driver on behalf of the Coalition to Defend Affirmative Action By Any Means Necessary. The objections filed by these persons fail to comply with the requirements of the notice. They fail to state that they are children eligible to attend the schools of the SFUSD, or the children's parents, legal guardians, or legal representatives. Accordingly, the Court grants the *Ho* plaintiffs' motion to strike the objections filed by these persons.

■ The Court denies the *Ho* plaintiffs' motion to strike the objections filed by Chinese For Affirmative Action ("CAA") and Multicultural Education, Training and Advocacy, Inc. ("META"). CAA and META have previously moved to intervene in the *NAACP* action on behalf of Chinese and Latino students, respectively. Although the Court denied the motions to intervene filed by CAA and META, the Court granted them *amici* status, recognizing that "expert understanding of the special situation of Latino and Asian students would greatly assist the work of the Advisory Committee." (Memorandum Decision & Order, filed July 21, 1993, at 18.) The Court granted them leave to propose members to be appointed to the Advisory Committee on their behalf. *Id.* As the Court previously has recognized their interests in the litigation, the Court will consider their objections to the proposed settlement.

The Court also denies the *Ho* plaintiffs' motion to strike the objections to the proposed settlement filed by the American Civil Liberties Union Foundation of Northern California ("ACLU"). In September 1996, the Court granted the ACLU *amicus* status in the *Ho* case. Although the *Ho* plaintiffs are correct that an *amicus curiae* is not a party to the litigation

and technically has no standing to object to the settlement, the Court will consider the ACLU's objections in light of their previous *amicus* status in the litigation, and the public importance of the case.

Accordingly, the Court grants the *Ho* plaintiffs' motion to strike the objections of Tania Kappner, Ronald T. Cruz, Mark Airgood, Yvette Felarca, Joyce Schon, and Heather Bergman and Shanta Driver on behalf of the Coalition to Defend Affirmative Action By Any Means Necessary. The Court denies the *Ho* plaintiffs' motion to strike the objections filed by CAA, META, and the ACLU.

9.

The Court now turns to the substance of the remaining objections to the proposed settlement. As will be explained below, most of the objections reflect a misunderstanding of the terms of the settlement or of the law that applies to desegregation orders.

a.

A number of the comments, including those of Dr. Orfield, express concern that, as a result of the changes in the student assignment plan, the schools of the SFUSD will become resegregated to the detriment of minority students. For example, Rayshone Bow, a student in the ninth grade at Galileo High School, writes:

> I want to speak against the proposed settlement because it will segregate the schools, putting black students in schools with poorer books and materials. That is not fair. We need to go to school with other kinds of people from different cultures and backgrounds so we can learn from each other. If you don't go to school with other kinds of people, how will you know how to work with each other in the work environment?

(Crowe Decl.Ex. I, Comments of Rayshone Bow.)

The proposed settlement does not preclude the SFUSD from attempting to ensure that each school has a diverse student

body. In fact, the settlement expressly acknowledges that, in assigning students to the schools of the SFUSD, "state and federal law provide that district officials may consider many factors, including the desire to promote residential, geographic, economic, racial and ethnic diversity in all SFUSD schools." (Proposed Settlement ¶ C.) The settlement merely precludes the SFUSD from using race or ethnicity as the primary or predominant consideration in determining student admissions, "except as related to the language needs of the student or otherwise to assure compliance with controlling federal or state law." (*Id.*)

The reason for this, as explained above, is that the United States Supreme Court has placed severe constraints on the use of race by the government. It was unlikely that defendants in the *Ho* action would have been able to meet their very heavy burden of showing that current problems in the SFUSD were causally related to governmental race discrimination that justified the adoption of the Consent Decree in 1983.

The proposed settlement eliminates the race-based student assignment plan, while acknowledging that the SFUSD may promote diversity in other ways as long as it does not use race or ethnicity as the primary consideration in its admission criteria. At trial, the State Superintendent was prepared to present testimony from David Ely ("Ely"), an expert in analyzing statistical and census information and in creating statistical modeling. Ely would have testified that it is possible to devise a student assignment system using a combination of individual and census-derived socioeconomic factors to assure reasonable socioeconomic diversity at each school, which would not result in the ethnic resegregation of the schools.

Dr. Orfield objects that a nonrace-based student assignment plan will not maintain a diverse student body. (Report on the Proposed Settlement by Dr. Gary Orfield at 5–6.) Because it is unlikely that defendants would have prevailed at trial on their contention that the race-based student assignment plan is still constitutional, there is no real choice but to consider a nonrace-based plan. Ely believes that such a plan can maintain diversity in the SFUSD, and submitted data in his expert report to support that belief. Because of the likelihood that the race-based plan would have been found unconstitutional, the Court will permit the parties to try a new system. The Court notes that the proposed settlement expressly provides for the possibility of further modifications to the Consent Decree if "identifiable racial or ethnic concentration at a particular school or schools [occurs] that will adversely affect the SFUSD's educational goals or programs in that school or schools." (Proposed Settlement ¶ G.) The Court finds that the parties' agreement that the SFUSD could attempt to achieve a diverse student body without using race-based student assignments was fair and reasonable in light of the very slim possibility that defendants would have prevailed at trial in defending the current constitutionality of the race-based student assignment plan set forth in paragraph 13 of the Consent Decree.

A number of the comments in opposition to settlement, including those of Dr. Orfield, express concern over recent newspaper articles about the decrease in African-American and Latino students at Lowell High School for the upcoming school year. Student assignments for the 1999–2000 school year had to be made on very short notice, without time to carefully devise a new, nonrace-based student assignment system that would create a more diverse student body. The Ninth Circuit has repeatedly told this Court that if defendants were unable to provide evidence to support the constitutionality of the race-based assignment plan, then the assignment plan must be adjusted for the 1999–2000 school year, because plaintiffs were suffering irreparable injury by being subjected to unconstitutional racial classifications. *See, e.g., Ho,* 147 F.3d at 865. As a result, neither the parties nor the Court had the luxury of waiting until the 2000–2001

school year to develop and implement a new assignment plan.

The settlement expressly provides, however, that a different assignment system will be devised for future years. (Proposed Settlement ¶ E.) Accordingly, the Court finds that the parties did the best job they could in crafting student assignments for the 1999–2000 school year, in light of extreme time pressures.

The Court finds that the proposed settlement permits the SFUSD to work to achieve a diverse student body, as long as it does not use race or ethnicity as a primary consideration in assigning students to schools. It recognizes that without the ability to assign students by race, some schools may become racially identifiable, and provides for the possibility of further modifications to the Consent Decree if that occurs. The Court finds that the proposed settlement is a fair, reasonable, and adequate means of ensuring a diverse student body, without using racial classifications that were likely to be found unconstitutional at trial.

#### b.

A similar objection raised by some of the comments in opposition to the settlement, including those of Dr. Orfield, is that the provision of the proposed settlement providing for termination of the entire Consent Decree by December 31, 2002 is arbitrary and will result in resegregation of the SFUSD.

The proposed settlement actually provides that the Consent Decree will terminate on December 31, 2002, "subject to Court approval." (Proposed Settlement ¶ A.) It also provides that "[t]he parties anticipate that no later than such time, the state and local governmental defendants shall have taken all reasonably practical measures to remedy any vestiges of segregation." *Id.* Thus, this provision of the proposed settlement actually sets a goal, by which time the SFUSD shall have taken all reasonably practical measures to achieve desegregation of the SFUSD. It does not set a date for automatic termination of the Consent Decree. The Court will not dissolve the Consent Decree if there is evidence that vestiges of segregation remain to be remedied.

It is important to understand that the Supreme Court has held that desegregation plans are not intended to operate in perpetuity. *Board of Educ. of Oklahoma City Pub. Schs. v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

> The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."

*Id.* at 248, 111 S.Ct. 630 (quoting *Spangler v. Pasadena City Bd. of Education,* 611 F.2d 1239, 1245 n. 5 (9th Cir.1979) (Kennedy, J., concurring) (citing *Milliken v. Bradley,* 433 U.S. 267, 280–82, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977))). A desegregation decree must be terminated if the school district has complied in good faith with the desegregation decree since it was entered, and the vestiges of past discrimination have been eliminated to the extent practicable. *Id.* at 249, 111 S.Ct. 630.

The Supreme Court has also recognized that a desegregation decree may be terminated in incremental steps.

> Just as a court has the obligation at the outset of a desegregation decree to structure a plan so that all available resources of the court are directed to comprehensive supervision of its decree, so too must a court provide an orderly means for withdrawing from control when it has been shown that the school district has attained the requisite degree of compliance. A transition phase in which control is relinquished in a gradu-

al way is an appropriate means to this end.

*Freeman,* 503 U.S. at 489–90, 112 S.Ct. 1430. The Consent Decree has now been in effect for sixteen years. The proposed settlement sets a goal of December 31, 2002 for the SFUSD to have taken all reasonably practical measures to remedy all vestiges of official segregation in San Francisco schools. The Court finds this goal to be an appropriate settlement of the *Ho* plaintiffs' concerns that the Consent Decree would continue in perpetuity.

c.

CAA and META, as well as Dr. Orfield, have filed objections to the proposed settlement on the ground that none of the parties has provided "adequate proposals to address the unique educational needs of monolingual, limited-English proficient students." (Crowe Decl.Ex. C, Comments of Chinese For Affirmative Action at 4; *see also id.* Ex. C, Comments of META at 4–5; Report on the Proposed Settlement by Dr. Orfield at 4–5.)

This Consent Decree was never intended to address issues relating to the education of limited English proficient students. In fact, at the time the Consent Decree was adopted in 1983, a separate consent decree, issued in *Lau v. Nichols,* C–70–0627 LHB, had already been adopted to address the needs of limited English proficient children. Nonetheless, the Ninth Circuit, in an unpublished order in the *NAACP* case, has suggested that language issues are relevant to the goals of the Consent Decree in accomplishing desegregation while improving the level of academic achievement for students throughout the SFUSD. *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 1994 WL 447279 at *2 (9th Cir. 1994).[4] Judge Fernandez stressed in his concurring opinion that "it is very important to recognize that [bilingual] concerns are involved in this case and that the district court will have to be particularly sen-sitive to them because the attorneys for the class plaintiffs are not." *Id.* at *2.

The Court notes that the proposed settlement in the *Ho* action expressly provides for the possibility that students may need to be assigned by race or ethnicity because of "the language needs of the student[.]" (Proposed Settlement ¶ C.) The Consent Decree Advisory Committee lately has been focusing on the education of limited English proficient students. There is nothing in the proposed settlement that precludes the SFUSD from taking action to address issues relating to the education of limited English proficient students.

d.

Certain parties, including Dr. Orfield, object to the portion of the proposed settlement that makes it optional for parents and students to identify themselves by race or ethnicity "except as required by state or federal statute or regulation." (Proposed Settlement ¶ D.) These parties argue that paragraph D is inconsistent with the requirement in paragraph G of the proposed settlement that "the SFUSD shall make available to the parties information concerning the racial composition of each school within the SFUSD." (*Id.* ¶ G.) They argue that it will be impossible for the SFUSD to provide accurate data on the racial composition of the schools unless the parents and students are required to identify themselves by race.

Throughout this litigation, the *Ho* plaintiffs have taken the position that merely requiring them to identify themselves by race is itself a violation of the Equal Protection Clause of the United States Constitution. Whether or not that position has legal merit, the parties agreed, as a condition of settlement, that the SFUSD would no longer require students to identify themselves by race, except as required by state or federal law or regulation. For the reasons explained above, defendants were unlikely to prevail at trial on the issue of

---

4. Although the order is unpublished, this Court may cite it pursuant to the "law of the

case" exception to Ninth Circuit Rule 36–3.

whether the race-based student assignment plan of the Consent Decree is currently constitutional. By agreeing to settle the case, they saved the community from a racially divisive trial.

The parties agreed to both paragraphs D and G of the proposed settlement. The settlement does not bar the SFUSD from educating parents and students about the reasons for requesting information about racial and ethnic identity and requesting that they voluntarily provide it. A statistical analysis may be able to accurately estimate the racial composition of each school based on the data voluntarily submitted. The settlement does not forbid the SFUSD from using the racial data it has already collected from students. Nor does the settlement preclude the SFUSD from collecting data on race and ethnicity that it is required to collect pursuant to state and federal law. Accordingly, the actual effect of paragraph D may be fairly minimal.

Nevertheless, the Court agrees that paragraph D may impede, to an unknown degree, the SFUSD's ability to accurately describe the racial composition of its schools, and as a result, to determine whether it has complied with the Consent Decree. As noted above, however, this Court cannot rewrite the settlement agreement. *Hanlon,* 150 F.3d at 1026. It cannot delete, modify or substitute certain provisions in favor of provisions that the Court would prefer. *Id.* The settlement must stand or fall in its entirety. *Id.*

Although the Court agrees that paragraph D poses some problems, it is not convinced that those problems outweigh the benefits to the entire city of avoiding a racially divisive trial. The issue is not whether the terms of the settlement could have been better, but whether it is fair,

reasonable, adequate, and free from collusion. The Court does not find paragraph D to be so unfair as to require jettisoning the entire settlement.

e.

META complains that the Latino community has not been meaningfully included in the settlement negotiations, and that none of the parties represent the interests of the Latino community or of Latino students enrolled in the SFUSD.[5] Similarly, Dr. Orfield objects that representatives of Latino students, other Chinese communities, immigrants, and limited English proficient children had no voice in the settlement negotiations. The Court is very interested, of course, in anyone's concerns that their interests are not being represented in this litigation.

When the Court denied the motions to intervene filed by CAA and META in 1993[6], it found that all minority schoolchildren were adequately represented by the NAACP because the NAACP shared an interest with CAA and META in desegregating the SFUSD and improving the educational performance of minority students. (Memorandum Decision & Order, filed July 21, 1993 at 15–16.) The Court also found that the NAACP case was entering a new phase where questions of educational policy were becoming more important than legal expertise. (*Id.* at 17.) "The success of maintaining the desegregation achieved and increasing the educational performance of historically disadvantaged children depends not on the number of lawyers prepared to bring noncompliance issues to Court, but the effective use of Consent Decree monies in support of carefully crafted educational policies." (*Id.* at 17–18.) Accordingly, the Court granted

---

5. In particular, META objects to the provisions of the proposed settlement that provide for termination of the Consent Decree in 2002, optional reporting of racial and ethnic data by students and parents, and to the alleged failure of the Consent Decree and the proposed settlement to address the needs of limited English-proficient students. These particular issues have been addressed individ-

ually above, and for the reasons stated above, do not justify rejection of the settlement.

6. CAA's motion to intervene was filed on behalf of itself and certain individuals. META's motion to intervene was filed on behalf of a number of organizations and individuals. For convenience, the Court will refer to these groups and organizations as CAA and META.

*amicus* status to CAA and META so that they could propose representatives to the Advisory Committee. (*Id.* at 18.) They proposed Dr. Laureen Chew and Dr. J. David Ramirez, who were appointed by the Court, and who remain members of the Consent Decree Advisory Committee to this day.

In denying the motions to intervene, the Court recognized: that at a future time, the present parties may be incapable of representing the interests represented by the *amici curiae* groups, and those interests would be seriously impaired if the *amici curiae* were not allowed to intervene.

(*Id.* at 19.) Accordingly, the Court denied the motions to intervene without prejudice.

The immediate effect of the proposed settlement is to eliminate race-based student assignments. There is nothing before the Court to suggest that other parties would have been able to prove that race-based student assignments are necessary to remedy the vestiges of prior governmental discrimination. META has not shown that its inability to participate as a party in the litigation has harmed the interests of Latino students in maintaining a race-based student assignment plan.

If any person or organization believes that it can prove that any part of the Consent Decree remains necessary to remedy vestiges of prior governmental discrimination that exist today in the SFUSD, it should bring that evidence to the attention of the parties and to the Consent Decree Advisory Committee. If any such person or organization believes that the current parties will not, or cannot, represent their interests, this also may be an appropriate time to bring a motion to intervene.

All of the parties to the *Ho* action, as well as the Consent Decree Advisory Committee and the State Consent Decree Monitor, have acknowledged that many problems exist today in the SFUSD. None of the parties to the litigation have been able thus far to demonstrate that the current problems in the SFUSD have been caused by the prior governmental discrimination that justified the adoption of the Consent Decree in 1983. If META, or any other party, believes that they can prove this difficult causation issue, and are willing to dedicate the time and money to do so, they are welcome to attempt to do so. The students of San Francisco will only benefit by such an effort.

 The Consent Decree can exist only as long as it is needed to remedy the original constitutional violations that justified its adoption in 1983. *See Freeman,* 503 U.S. at 489, 112 S.Ct. 1430 ("A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation."); *id.* at 496, 112 S.Ct. 1430 ("The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied.") By the terms of the proposed settlement, the Consent Decree will terminate by December 31, 2002, subject to approval of the Court. The Supreme Court has held that the party moving to terminate a desegregation consent decree must demonstrate good-faith compliance with the Consent Decree since it was entered, and that the vestiges of past discrimination have been eliminated to the extent practicable. *Dowell,* 498 U.S. at 249–50, 111 S.Ct. 630; *see also Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (the party seeking to modify a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.). The Consent Decree will remain in effect as long as there is evidence that vestiges of segregation remain to be remedied.

If any person who opposes the settlement of this action believes that (1) vestiges of segregation still exist in the SFUSD; (2) the Consent Decree, or some part thereof, is necessary to remedy those vestiges of segregation; and (3) none of the current parties to the litigation represents

his or her interests, that person now has three years to seek to intervene in the action and to gather the evidence necessary to oppose termination of the Consent Decree.

f.

Dr. Orfield recommends that if the Court approves the proposed settlement, it should increase its oversight of the Consent Decree by directing all parties to respond to the recommendations in the recent reports by the Consent Decree Advisory Committee and the State Consent Decree Monitor, and by holding regular hearings on the progress of the parties. The Court will adopt this suggestion. As the parties move toward the goal of remedying all remaining vestiges of segregation to the extent reasonably practicable, the Court will assist the parties by requiring them to (1) respond to the recent reports submitted to the Court by the Advisory Committee and Consent Decree Monitor Stuart Biegel, and (2) submit a plan for addressing the issues raised in those reports. The Court will also hold yearly hearings specifically to require the parties to address the findings in the yearly Consent Decree Monitor Reports and to create a detailed record for the final determination of whether the goals of the Consent Decree have been fulfilled to the extent reasonably practicable.

III.

Accordingly,

IT IS HEREBY ORDERED that:

1. The *Ho* plaintiffs' motion to strike the objections to the proposed settlement filed by Tania Kappner, Ronald T. Cruz, Mark Airgood, Yvette Felarca, Joyce Schon, and Heather Bergman and Shanta Driver on behalf of the Coalition to Defend Affirmative Action By Any Means Necessary is GRANTED.

2. The *Ho* plaintiffs' motion to strike the objections to the proposed settlement filed by CAA, META and the ACLU is DENIED.

3. The Court approves the proposed settlement of the *Ho* action as fundamentally fair, reasonable, and adequate.

4. No later than August 6, 1999, the parties will submit to the Court a stipulated, modified Consent Decree that incorporates the changes set forth in the settlement agreement.

5. No later than August 6, 1999, the parties will submit to the Court a stipulated form of preliminary injunction, pursuant to paragraph H of the settlement agreement.

6. No later than October 1, 1999, the parties will submit a stipulated proposed student assignment plan for the 2000–01 school year, for the Court's approval, pursuant to paragraph E of the settlement agreement. If the parties cannot stipulate to a student assignment plan, one or more parties will file a motion by October 1, 1999 seeking a court order adopting its proposed assignment plan. The Court will hold a public hearing on the proposed student assignment plan(s) for the 2000–01 year on Friday, November 5, 1999 at 10:00 a.m.

7. No later than August 6, 1999, the parties in the *NAACP* action will submit a stipulated briefing schedule for the parties to file memoranda addressing the findings in the most recent reports from the Consent Decree Advisory Committee and Consent Decree Monitor Stuart Biegel. The parties will submit plans and a timetable for addressing each of the problems in the SFUSD that are identified in those reports. If any party disputes the existence of a particular problem, that party shall submit an evidentiary basis for that party's conclusion that the problem does not exist, or does not need to be remedied. The parties will also submit a proposed hearing date, within the next six months, to address the issues raised in the reports and their memoranda.